Richard HILL, Plaintiff-Appellee,

v.

TEXACO, INC., Defendant-Appellant.

No. 80–1926.

United States Court of Appeals, Fifth Circuit.

April 30, 1982.

Rehearing Denied June 10, 1982.

448

Baker & Botts, Arthur Stamm, Houston, Tex., for defendant-appellant.

Edwards & Perry, Russell H. McMains, Corpus Christi, Tex., for plaintiff-appellee.

Before DYER *, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

* Circuit Judge of the Eleventh Circuit, sitting by designation.

1. Section 905(b) provides:
   In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing ship building or repair services to the vessel. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

JERRE S. WILLIAMS, Circuit Judge:

Richard Hill was injured when he fell from the wall of a tank he was inspecting aboard the vessel the TEXACO ILLINOIS. Hill collected compensation payments from his employer, Evans Engineering, Inc. (Evans), an independent contractor, then brought suit against the vessel's owner, Texaco, Inc. (Texaco). Hill charged the ship with negligence under § 905 of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b).[1] After a bench trial, the court awarded damages to Hill, 499 F.Supp. 470 (S.D.Tex.1980), and Texaco appealed.

On January 17, 1975, Richard Hill began to climb the walls of a gasoline storage tank aboard the tanker the TEXACO ILLINOIS. Hill's employer, Evans, was an independent contractor that Texaco had hired to determine the effect of rust on the thickness of the tank walls. January 17 was the third day that Evans had been conducting tests on the TEXACO ILLINOIS. Hill carried with him ultrasonic testing equipment to perform the tests. Because the tank had been drained of ballast water only three hours earlier, the tank was damp and slippery. The walls of the tank were also covered with loose rust. Hill ascended by standing on "stiffeners"—shelf-like projections from the tank walls. The stiffeners were also covered with rust. When Hill was approximately 30 feet above the bottom of the tank, a piece of rust on the stiffener on which he stood became loose, and Hill lost his footing. Because Hill wore

no safety belt or safety lines to break his fall, Hill fell to the tank floor. The fall resulted in heel and back injuries to Hill and a lawsuit against Texaco.

## I.

The district court found that Hill was 20% negligent, that Evans, Hill's employer, was 60% negligent, and that Texaco, the vessel owner, was 20% negligent. Under the rule of *Edmonds v. Campagnie General Transatlantique*, 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979), Texaco was held liable both for its own negligence and for Evans' negligence. The district court concluded that Texaco was negligent because Texaco failed to ensure that Hill used proper safety equipment when climbing the tank walls. This conclusion rested on three factual findings.

First, the district court found that Texaco knew that the sides of the walls were rusty and damp. The effect of rust on the tank walls was precisely what Evans had been hired to test. The dampness resulted from the recent discharge of ballast water from the tank, also well known to Texaco. Second, the court found that Texaco knew that to climb the walls of the tank without a safety line was dangerous. Third, the court found that Texaco knew that Hill was not using safety equipment despite both Hills' and Evans' appreciation of the danger of slipping on the wet, rusty stiffeners. On the basis of these three findings, the district court concluded that Texaco had a duty to step in and insist that Hill either use safety equipment or terminate the tests.[2]

The linchpin of the district court's reasoning is its factual finding that Texaco knew that Hill was not using safety lines when he began his spider-like climb up the walls of the tank. The district court made this finding as an inference from two pieces of evidence. First, the ship's mate, Billy Yawn, testified that he saw the Evans personnel on deck before they descended into the tank and noticed that they had no safety equipment with them. From this, the court inferred that Yawn knew that Hill wore no safety lines when performing the tests. Second, because Evans had been working on the vessel for two days before the day of Hill's fall, "this court infers that the captain and other officers of the Texaco Illinois who were on board the entire time Evans' crew worked, knew or should have known the method and safety devices Evans' crew used to test the metal thickness, at least by the end of Hill's first day of work." 499 F.Supp. at 472. We think that neither inference is warranted.

A review of the record shows that Yawn, the ship's mate, did not testify that he saw Hill climb the tank without safety equipment. Nor did Yawn testify that he saw the Evans' personnel descend into the tank without such equipment. All Yawn said was that *three hours* before Hill's fall, Yawn saw the Evans' employees on deck and he noticed no safety equipment. This testimony does not permit the inference that Yawn knew that Hill was working below deck without safety equipment. Three hours elapsed between Yawn's observations and the beginning of the test. What Yawn saw on deck provides no good indication of what transpired below deck three hours later. The district court's inference to the contrary is clearly erroneous.

The district court also inferred that the ship had knowledge of the type of safety equipment used by Evans because Evans

2. The district court applied the land-based standards of conduct found in the Restatement (Second) of Torts, § 343 and § 343A. We approved this practice in *Gay v. Ocean Transport and Trading, Ltd.*, 546 F.2d 1233, 1242 (5th Cir. 1977), but the Supreme Court in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), held that such land-based standards "do not furnish sure guidance" in maritime cases under the LHWCA. 101 S.Ct. at 1622 n.14; *Lemon v.* *Bank Lines, Ltd.*, 656 F.2d 110, 114 (5th Cir. 1981). *Scindia* thus prescribes a new regime in allocating the duties between those contractors hired to work on board the vessel and the vessel itself. Because we differ from the district court's factual premises, however, we need not discuss whether the district court's application of land-based standards would have had any impact on the result in this case that is inconsistent with *Scindia*.

had been working on the ship for two days prior to Hill's fall. This inference lacks adequate foundation. There was no testimony that members of the ship's crew participated in or supervised Evans' work. Nor was there testimony that the ship asked Evans what safety equipment he used. The district court's finding rests solely on the assumption that the simultaneous presence on the ship of Evans and the crew yielded knowledge of Evans' methods.

On similar facts, we have previously rejected such a speculative leap. In *Stockstill v. Gypsum Transportation*, 607 F.2d 1112 (5th Cir. 1979), a welder employed by an independent contractor fell from a ladder while descending into a tank aboard the ship. After the fall, a patch of oil or grease was discovered above deck in the vicinity of the tank. The welder sued the vessel alleging that the vessel knew that the grease spot existed and negligently failed to remedy the hazardous condition. We affirmed a directed verdict for the vessel, reasoning in part that the vessel could not be charged with knowledge of the grease spot. "Appellant relies heavily on the fact that some members of the ship's crew were on board the vessel at the time of the accident. Mere presence of the vessel's crew on the ship, however, does not prove knowledge of the hazardous condition." 607 F.2d at 1117. The evidence of Texaco's knowledge here— that Evans had worked aboard the TEXACO ILLINOIS for two days prior to the injury—is no stronger than in *Stockstill*.

The district court also inferred that the vessel should have known what type of safety equipment Evans used. This inference presumes that the ship had some duty to supervise Evans' performance of its work. As we shall see, however, the ship had no such duty. *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Without a duty of supervision, we cannot attribute knowledge to Texaco when it had none.

The district court's findings of fact, of course, are shielded against reversal unless "clearly erroneous." Fed.R.Civ.P. 52(a); *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948); *Wright v. Western Electric Co.*, 664 F.2d 959, 963 (1981). We are convinced, on reviewing the record, that the inferences that the district court drew from the evidence in this case cannot stand. The evidence does not show that Texaco had knowledge that Hill ascended the tank's wall without safety equipment. We must conclude that on this record Texaco was not shown to have actual knowledge of the hazard to which Hill was exposed because of his failure to use safety equipment. Texaco cannot be held liable, then, on the basis of an alleged actual knowledge of dangers upon which it did not act.

II.

Our second inquiry is to determine if Texaco is liable to Hill even though it had no knowledge of the way the work was being carried out. We are guided in this quest by *Scindia Steam Navigation Co. v. De Los Santos, supra*, which the Supreme Court handed down after the district court decided this case. In *Scindia*, a longshoreman was struck and injured by sacks of wheat that fell from a pallet suspended by a defective ship's winch. The stevedore had been using the winch for two days prior to the accident despite its malfunction. The longshoreman sued the ship under § 905(b) of the LHWCA.

The district court applied land-based negligence standards to the ship and held that the shipowner had no duty to supervise the stevedore's work nor warn the longshoreman of open and obvious dangers. The district court therefore granted summary judgment for the vessel. The Court of Appeals for the Ninth Circuit reversed, holding that the ship had a duty of "reasonable care under the circumstances to protect the longshoremen against the danger," *Scindia*, 101 S.Ct. at 1620. The Court of Appeals then remanded for resolution of fact questions under this standard. The Supreme Court affirmed the Court of Appeals, but did so under a different rationale.

In *Scindia*, the Court articulated three general principles to govern the duties of a

vessel towards the employees of a stevedore. First, before the stevedore begins his work, a shipowner must exercise care to make safe the portions of the ship that it turns over to the stevedore. In discharging this duty the ship may rely on the stevedore's performing its task with reasonable care. The shipowner must also warn the stevedore of hidden unsafe conditions on the ship of which the ship is, or should be, aware. 101 S.Ct. at 1621.

Second, once the stevedore begins its operations, the shipowner has no general duty to supervise work or to inspect the area assigned to the stevedore, unless custom, contract, or law imposes such a duty on the shipowner. The shipowner need not monitor the stevedore's operations; rather, the shipowner is entitled to rely on the stevedore's expertise and reasonableness. 101 S.Ct. at 1624.

Third, the Supreme Court made an exception to the general absence of a duty of the shipowner to protect employees of the stevedore during cargo operations.[3] The duty arises when two conditions are fulfilled. *If* the shipowner becomes aware during the stevedore's work that the ship or its gear poses a danger to the longshoremen, and *if* the shipowner also learns that the stevedore is acting unreasonably in failing to protect the longshoremen against the danger, then the shipowner acquires a duty to intervene and protect the longshoremen. The shipowner can have knowledge of a defect if the defect develops during the stevedore's operations and the shipowner has actual knowledge, or if the defect exists at the outset and the ship "must be deemed" to have knowledge of it.[4] 101 S.Ct. at 1626.

■ The rationale of *Scindia* is not limited to stevedoring operations. It clearly applies to any independent contractor and its harborworker employees covered by the LHWCA and working aboard ship. Applying *Scindia* to the facts of this case, we see

no basis for imposing liability on Texaco. Hill's injury occurred when the operations —here, an inspection of vessel tanks—were underway. Under *Scindia*, Texaco had no duty to oversee this work to make sure it was conducted safely. Texaco was entitled to rely on Evans' expertise to perform his job with reasonable precautions. Evans, not Texaco, had a duty to require Hill to use safety equipment. *See* 33 U.S.C. § 941; *Marler v. International Grain Corp.*, 523 F.Supp. 518, 521 (N.D.La.1981) ("... the duty to furnish safety equipment for climbing purposes, both safety belts and installation of the ladders[,] was upon the contractor, not upon the owner[,] and the owner was entitled to assume that the contractor would take the necessary steps and provide the necessary equipment to insure a 'reasonably safe place' for his employees to work.").

Moreover, the *Scindia* exception, which requires the vessel to protect a longshoreman or harborworker when the vessel knows of an unsafe condition and knows that the independent contractor is not adequately guarding the longshoreman or harborworker against the danger, has no application here. Texaco, we have found above, had no knowledge that Evans was permitting Hill to climb the stiffeners without safety equipment. In the absence of such knowledge, Texaco was not negligent in failing to act. Thus, Texaco could be found liable only if it had negligently turned over to Evans an unsafe place to work, or failed to warn of a hidden danger. We conclude that Texaco did neither.

■ Hill strenuously argues that the damp and rusty walls of the tank were in an unsafe condition when Texaco turned the vessel over to Evans. It is true that the walls were rusty, but this condition is no occasion for holding that Texaco was negligent. Evans was hired as a specialist precisely to test the effect of rust on the thickness of the walls of the tank. Hill can

3. *See Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 115 (1981).

4. *See Pluyer v. Mitsui O.S.K. Lines, Inc.*, 664 F.2d 1243 (5th Cir. 1982); *Wild v. Lykes Bros. Steamship Corp.*, 665 F.2d 519, 521 (5th Cir. 1981) (per curiam).

hardly argue that the ship was required to strip the tank walls of rust before turning the work over to Evans to test.

We reached a similar conclusion in *Hess v. Upper Mississippi Towing Corp.*, 559 F.2d 1030 (5th Cir. 1977). In *Hess*, the shipowner hired a specialist to free a barge of residual gas vapors that posed a risk of explosion. An employee of the specialist sued the vessel after an explosion injured him during the gas-freeing process. We held that the ship had not breached a duty to the employee because "[t]he precise reason for the plaintiff's employment was to make an unsafe condition safe." 559 F.2d at 1036.

The rationale of *Hess* finds support in *West v. United States*, 361 U.S. 118, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959). In *West*, a shipowner turned over a vessel to an independent contractor for a complete overhaul. The vessel, having languished unused for several years, was completely unseaworthy. The purpose of the overhaul was to restore the vessel to a seaworthy condition. During the overhaul, an employee was injured when attempting to repair one of the many defective conditions on the ship. The employee alleged that the shipowner had negligently failed to furnish him a safe place to work. The Supreme Court rejected this theory, reasoning:

> It appears manifestly unfair to apply the requirement of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The respondent, having hired Atlantic to perform the overhaul and reconditioning of the vessel—including the testing—was under no duty to protect petitioner from

risks that were inherent in the carrying out of the contract.

361 U.S. at 123, 80 S.Ct. at 193. As in *West*, the risk faced by Hill was one "inherent in the carrying out of the contract." Under these unique circumstances, Texaco breached no duty to provide a safe place to work.[5]

■ Hill also urges that Texaco was negligent in turning over the tank to Evans immediately after purging the tank of ballast water. Undoubtedly, the damp walls of the tank exacerbated the slippery conditions of the stiffeners created by the loose rust. But that alone does not violate Texaco's duty to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore [or independent contractor supplying services] will be able by the exercise of reasonable care to carry on its cargo [or other] operations with reasonable safety to persons and property...." *Scindia*, 101 S.Ct. at 1621.

The tank, although wet, posed only a limited and accepted hazard to Hill until he elected to climb the rusted stiffeners without a safety line. Evans, as an expert in its field, could have brought safety lines with it or borrowed them from the ship. Had Evans done so, Hill could have completed the test with a reasonable degree of safety. *Scindia* teaches that the ship is entitled to assume that the independent contractor aboard ship will act reasonably with a view towards the safety of its employees. 101 S.Ct. at 1624. Were this not so, the LHWCA's imposition of a negligence standard rather than a seaworthiness standard on the vessel's conduct towards the harborworkers would mean nothing.[6] We therefore conclude that there is no basis for

**5.** In so holding, we do not resurrect the notion that a shipowner may defend against a longshoreman's action by proving that the hazard that injured the longshoreman was "open and obvious." We have read *Scindia* to repudiate this defense. *See Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 114 (5th Cir. 1981). We hold only that a ship may not be found negligent merely because a condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition.

**6.** Before the enactment of the 1972 amendments to the LHWCA, longshoremen could recover against shipowners for the unseaworthiness of the vessel. *Scindia*, 101 S.Ct. at 1620–21. A duty of seaworthiness is a duty to guarantee the safety of the vessel without regard to fault. The effect of the 1972 amendments is to insulate the shipowner from liability without fault.

holding Texaco liable for Hill's injuries aboard the TEXACO ILLINOIS. The judgment of the district court is REVERSED.