Allen Carlos WOODRUFF, Appellant,

v.

UNITED STATES of America, Appellee.

No. 82–1491.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1983.
Decided May 26, 1983.

C. Arthur Rutter, Jr., Norfolk, Va. (Breit, Rutter & Montagna, Norfolk, Va., on brief), for appellant.

Larry W. Shelton, Asst. U.S. Atty., Norfolk, Va. (Elsie L. Munsell, U.S. Atty., Alexandria, Va., on brief), for appellee.

Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and FIELD, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge.

Allen Carlos Woodruff, a longshoreman severely injured after accidentally falling over the side of a docked United States aircraft carrier on which he was working, brought suit in negligence against the United States as shipowner. At the conclusion of a bench trial, the district court entered judgment for the United States. The court reasoned that the risk of injury was not "reasonably foreseeable" by the Navy because the longshoreman's stevedore-employer had assumed full responsibility for work-area safety. Woodruff appeals, contending that the district court misapplied the controlling legal standard. We agree, and reverse. We remand for entry of a judgment of liability and the determination of damages.

### I.

Neither party challenges the district court's findings of fact. These we summarize: In February 1981, Woodruff was a longshoreman[1] employed by stevedore[2] Douglas Call Company in the application of a non-skid coating to the deck of the USS GUADALCANAL. On the morning of February 9, Woodruff was clearing objects from an area of the flight deck. While dragging a heavily laden pallet close to the ship's edge onto an elevator platform then level with the deck, Woodruff tripped. He lost his balance, plunged overboard, and fell some fifty feet to the dock below before bouncing into the water. Woodruff was severely injured, but he survived.

Woodruff unluckily had stumbled at one of the few spaces along the edge of the GUADALCANAL that lacked safety nets hinged out from the side of the ship. On each side of the aircraft carrier an elevator platform is cut into the deck for use in raising and lowering helicopters stored below. By design, when the elevator lowers, stanchions with a wire strung between them automatically rise from the deck to create a safety barrier around the hole left by the depressed elevator. When the elevator rises back to flight deck level, the automatic stanchions retract, leaving a four-foot wide "void" in the safety netting along the side of the ship. However, a set of four manually-placed stanchions can be set in holes drilled into the deck approximately six inches away from the ship's edge. When so placed, the stanchions are rigged to fill this "void" with a wire barrier.

The manual barrier was not in place on the morning of the accident. The Call Company had contracted to apply non-skid material to within four inches of the deck's edge. According to Call's president and its operations manager, Call Company determined that placement of the portable stanchions during actual application of the non-skid material would have interfered with its performance according to the specifications, so Call had not requested rigging of the wire barrier. The Navy, however, was fully aware that Woodruff and others were working in the vicinity of the four-foot gap, and the stanchions were at all times under the Navy's control. Woodruff also knew that the gap existed, and was found to have been careless and inattentive in working near the hazard.[3]

Woodruff brought suit under § 5(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA), 33 U.S.C. § 905(b), alleging the government's negligence as shipowner in failing to erect the wire barrier or otherwise block the "void". Although § 905(b) establishes a negligence

---

1. We use the term "longshoreman" generically to designate any employee covered under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901 *et seq.*, as amended in 1972, Pub.L. 92–576, 86 Stat. 1251. *See LeMelle v. B.F. Diamond Construction Co.,* 674 F.2d 296 (4 Cir.1983), *cert. denied,* — U.S. —, 103 S.Ct. 830, 74 L.Ed.2d 1024 (1983).

2. "Stevedore" is also used in the generic sense of "employer" as defined at 33 U.S.C. § 902(4), § 2(4) of the LHWCA.

3. Because the district court found recovery against the government barred, it made no apportionment of the relative degrees of fault.

standard,[4] the contours of LHWCA liability had been a subject of disagreement among the circuits prior to the resolution of conflicting interpretations in *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981). Now, however, because we recently articulated the law governing this area after *Scindia* in *Gill v. Hango Ship-Owners/AB,* 682 F.2d 1070 (4 Cir.1982), our inquiry in this case is greatly narrowed to the question of whether the district court correctly applied that law.

## II.

Despite ruling prior to *Gill,* the district court to a large degree correctly discerned the proper duty of care owed. In *Gill* we stated that the shipowner[5] is negligent "if it should have anticipated harm despite the fact that the risk of harm created by [a shipboard condition or practice] was open and obvious." 682 F.2d at 1074. The district court, relying on our earlier opinion in *Harris v. Reederei,* 657 F.2d 53 (4 Cir.1981), accurately verbalized this standard, including the proviso that the injury to the longshoreman must be a "reasonably foreseeable" consequence of exposure to the open and obvious hazard for the shipowner to be liable. *See Gill, supra,* 682 F.2d at 1074.

■ Where the district court erred was in its holding that the injury is not as a matter of law "reasonably foreseeable" when the shipowner has some valid basis for relying on the stevedore to take charge of safety precautions. This view was specifically rejected in *Scindia.* There, Scindia,

the shipowner, argued that even if it knew or was chargeable with knowledge of a malfunctioning winch, "it was nevertheless entitled to assume that Seattle, the specialist in loading and unloading [and the stevedore], considered the equipment reasonably safe and was entitled to rely on that judgment." 451 U.S. at 175, 101 S.Ct. at 1626. The argument was rejected:

Yet it is quite possible, it seems to us, that Seattle's judgment in this respect was so obviously improvident that Scindia, if it knew of the defect and that Seattle was continuing to use it, should have realized the winch presented an unreasonable risk of harm to the longshoremen and that in such circumstances it had a duty to intervene and repair the ship's winch. (footnote eliminated)

451 U.S. at 175–76, 101 S.Ct. at 1626. *See also, Gill, supra,* 682 F.2d at 1074. The district court's understanding of "reasonably foreseeable" would render this ultimate duty meaningless.

■ Under the guiding legal standard, then, the district court's findings of fact lead to no other conclusion than that an "obviously improvident" lapse by the stevedore occurred here. The evidence established that the Navy understood that the absence of netting created a serious hazard. As the district court stated in its bench ruling, "The Navy obviously knew that there was a hazard in this area because they designed in their plans, when they built the ship, according to the expert here who got the plans and reviewed them, a stanchion and rope system to guard against

4. Section 905(b) reads in pertinent part:

(b) In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party in accordance with the provisions of section 933 of this title, and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negli-

gence of persons engaged in providing stevedoring services to the vessel.

\* \* \* \* \* \*

The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel except remedies available under this chapter.

5. Under 33 U.S.C. § 902(21) the "vessel" liable under § 905(b) is defined to include "said vessel's owner, owner pro hac vice, agent, operator, charter or bare boat charterer, master, officer, or crew member."

that opening." Placing the manual stanchions as a barrier against Woodruff or anyone else working in the area falling overboard required a minimum of effort. The choice to have the stanchions absent from the elevator area, to be sure, was found to be the stevedore's.[6] But the stevedore's primary interest was in a fast and convenient performance of its contract. Call Company took no alternative precautions, an omission that was apparent to the Navy personnel in that area of the ship while the work progressed. Exposing the longshoreman to the risk of a sheer drop some fifty feet onto the dock below or into the water, by foregoing the available safety device without any offsetting precautions, was "obviously improvident" as a matter of law. Although the Navy may have preferred to rely completely on the stevedore to protect longshoremen, "in such circumstances it had a duty to intervene". *Scindia, supra,* 451 U.S. at 176, 101 S.Ct. at 1626; *see also, Gill, supra,* 682 F.2d at 1075.

### III.

In oral argument before us (but not in its brief), the government nonetheless contends that all responsibility for safety precautions had been shifted to Call Company by contract, and that such a contract overrides the duty otherwise owed by the shipowner.[7] We do not reach this issue,

6. The necessity of removing the stanchions from the "void" area at the time Woodruff was working near there is less than clear. Douglas Call, the company's president, admitted that the non-skid material had already been applied to the elevator surface prior to the day of the accident. He asserted that the stanchions only needed to be removed from an area of deck long enough for the material to "cure." He went on to concede that he did not know of any reason why the portable stanchions were not placed in the holes in the elevator to form a barrier on the morning of the accident.

Somewhat in contradiction was the testimony of Call Company's operations manager. He testified that the elevator, but not the surrounding deck area, had indeed been resurfaced just a few days before the accident and had not yet "cured" by February 9. But the consequence of this was that none of the resurfacing machinery that was to be used in the adjacent areas that day could have traveled across the elevator area without hurting the new surface. As a result, "we were moving stuff by our hands to get it out of the way and onto the elevator"—i.e., the elevator was nonetheless sufficiently "cured" to allow heavy pallets and other objects to be stored in it. In addition, because the elevator itself had already been resurfaced, the placing of stanchions in the holes cut into the elevator would not have interfered with application of the material to within four inches of the edge. Moreover, the operations manager expressed his surprise at the fact that in several weeks aboard the GUADALCANAL prior to the accident he had never seen any stanchions erected as a barrier on the elevator in front of the "void," whether or not Call personnel needed to work in the area.

Despite this evidence, the district court concluded that Call Company wanted the deck to be clear of stanchions in areas where it was to work, and that the elevator was such an area. More importantly, we note that the district court did not make a specific finding that Call had actually requested that stanchions not be placed manually on the elevator on the day of the accident, but rather appears to have inferred such to be the case because of Call's general practice of supervising the safety of its employees. Nor did the court make any finding concerning the apparent contradiction between Douglas Call's statement that stanchions could not be simply stood in the holes drilled into the deck until the area had "cured," and the operations manager's testimony that even an uncured area was a suitable place onto which to drag heavy objects. We need not consider whether these findings are "clearly erroneous," however, because the result we reach is only reinforced if in fact the Navy not only had not removed the stanchions due to a specific, work-related request by Call to do so, but, in addition, had never erected the manual barrier at any time. Accordingly, we simply state in the text the district court's factual conclusions explaining the absence of a barrier while Woodruff worked near the "void," and confine our reservations to this footnote.

7. The government also suggests that the Safety and Health Regulations for Shipyard Employment, 29 C.F.R. Part 1915, cast all responsibility for work area safety on the stevedore Call Company. But the regulations referred to in fact expressly state that no such alleviation of the shipowner's liability is effected:

(b) This part [29 C.F.R. Part 1915] does not apply to owners, operators, agents or masters of vessels unless such persons are acting as "employers." However, this part is not intended to relieve owners, operators, agents or masters of vessels who are not "employers" from responsibilities or duties now placed upon them by law, regulation or custom.

29 C.F.R. § 1915.3(b). Whatever duties or liabilities the regulations may create for Call

however. No express written or oral agreement delegating full safety responsibility to Call Company has been brought to our attention, nor have we located one in the record.[8] We do not think that such a contract can be implied from the relationship of the parties, their conduct or the documents which passed between them.

■ Having concluded that there was liability on the part of the government as a matter of law, we reverse the judgment of the district court and remand the case for entry of a judgment of liability and the assessment of damages.[9] It is conceded by plaintiff's counsel that plaintiff was contributorily negligent at least in part. Of course, contributory negligence is not a total bar to recovery for a maritime tort, *Pope & Talbot, Inc. v. Hawn*, 346 U.S. 406, 408–09, 74 S.Ct. 202, 204–05, 98 L.Ed. 143 (1953), but plaintiff may recover only to the extent that his fault did not cause his injuries. The district court on remand will therefore determine total damages and the extent to which recovery accordingly shall be allowed against the government.

REVERSED AND REMANDED.

■

---

Company, none are abolished for the Navy. *See Subingsubing v. Reardon Smith Line, Ltd.,* 682 F.2d 779, 780 (9 Cir.1982); *Lieggi v. Maritime Co. of the Philippines, "M/V Philippine Rizal",* 667 F.2d 324, 328 n. 8 (2 Cir.1981).

**8.** The district court did not consider the contention nor did it indicate that such an explicit contractual provision existed.

**9.** The government will be liable for the full extent of plaintiff's injuries notwithstanding proof of concurrent negligence contributing to the injury on the part of Call, diminished only by plaintiff's contributory negligence. *Edmonds v. Compagnie Generale Transatlantique,* 443 U.S. 256, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979).