**Marvin BASS, Plaintiff,**

v.

**AETNA CASUALTY & SURETY COMPANY, Intervenor,**

**United States of America, Defendant.**

**Civ. A. No. S84-0809(NG).**

United States District Court,
S.D. Mississippi, S.D.

Dec. 20, 1988.

 

Judy M. Guice and Paul S. Minor, Biloxi, Miss., for Marvin Bass, plaintiff.

Fred Feeney and Richard P. Salloum, Gulfport, Miss., for Aetna Cas. & Co., intervenor.

Stephen R. Graben and Peter H. Barrett, Asst. U.S. Attys., Biloxi, Miss., for U.S., defendant.

## OPINION

GEX, District Judge.

Marvin Bass, plaintiff, filed this action against the United States of America, defendant, seeking to recover monetary damages for personal injury allegedly sustained by him on December 9, 1983, while working on the main weather deck of the U.S.S. IOWA as a joiner for Ingalls Shipbuilding Division of Litton Systems, Inc., [Ingalls]. The U.S.S. IOWA is, and at all relevant times herein was, a battleship owned by the United States through the Department of the Navy. On July 13, 1982, the United States, acting through the Naval Sea Systems Command, Department of the Navy, and Ingalls, entered into Contract No. N00024–82–C–2115 [contract] for the reactivation and modernization of the U.S.S. IOWA. The U.S.S. IOWA arrived at the Ingalls facility in Pascagoula, Mississippi, on or about January 30, 1983.

The cause was tried before the Court on April 7, 1987, and, at the conclusion of the testimony, was taken under advisement for the rendering of a decision. The Court, having carefully considered all the evidence, the record, and the applicable law, hereby enters its Opinion pursuant to Rule 52 of the Federal Rules of Civil Procedure.

### Statement of Facts

1. Plaintiff suffered several injuries prior to his accident of December 9, 1983, including a gunshot wound to the soft tissue of the back, a gunshot wound to the chest, a 1975 back injury, a 1978 shoulder injury, a 1979 repair of a hernia, a 1979 repair of the ulnar nerve, and a 1980 hospitalization due to a back injury. Plaintiff also had degenerative disc disease prior to this December 9, 1983, back injury.

2. On or about August 13, 1983, plaintiff had an employment physical for Ingalls which included x-rays of his back. All aspects of his physical examination were normal.

3. In the fall of 1983, plaintiff was assigned by Ingalls to work on the U.S.S. IOWA as a joiner.

4. The reactivation and modernization of the U.S.S. IOWA required the use of a variety of tools and equipment, many of which were powered by compressed air, electricity, liquids, or gasses, such as oxygen or acetylene. A variety of service lines (cables, hoses, tubing, and wiring) were used to deliver the required power to such tools and equipment.

5. A distribution network of these service lines was suspended approximately six feet above the U.S.S. IOWA's main deck by metal racks. These racks belong to and were installed by Ingalls. Each rack is essentially a metal post terminating in a cross bar and two vertical pipes at the ends of the cross bar (resembling a football goal post). Each rack was welded to the deck and remained in place until the weld was broken by Ingalls and the rack was removed.

6. Invariably, these service lines would sag between the racks as low as three feet.

7. From time to time Ingalls would lower materials onto the main weather deck of the U.S.S. IOWA in large metal boxes referred to as carriages belonging to Ingalls with a minimum dimension of six feet by eight feet. These boxes extended to a height of approximately three feet on three sides with the fourth side being open to permit access to the material in the box. The base of each box was elevated approximately eight inches above the ground.

8. In or about December of 1983, Captain Arnold Ristad was project officer on the U.S.S. IOWA and as such was responsible for insuring that Ingalls adhered to the specification in the contract and that the work was proceeding as scheduled. As project officer he went on board the vessel at least twice each week. Captain Ristad had on occasion observed the sagging service lines. He had also observed Ingalls employees lower carriages onto the deck of the U.S.S. IOWA from time to time for the unloading of work materials and supplies. Captain Ristad, however, never observed an Ingalls carriage placed on the deck of the U.S.S. IOWA with sagging service lines draped over it and he never observed a carriage placed at a juncture of the service lines. Captain Ristad testified that he had no knowledge of the details of the U.S.S. IOWA, the condition of the service lines, or the location of the carriage on December 9, 1983.

9. In or about December of 1983, there were approximately three hundred to five hundred ship crew under the supervision and control of the commander of the U.S.S. IOWA assigned to the vessel. The commander of the U.S.S. IOWA went on board the vessel at least twice each week. The crew at that time was housed in barracks on the dock at Ingalls; however, the crew, based on work assignments from its commander, was involved in daily training aboard the vessel in December of 1983, and in fact, did do some painting and other light work on the weather deck of the vessel. There is no testimony in the record to reflect that the commander or any of the crew of the U.S.S. IOWA ever observed any sagging service lines, or any carriage placed on the deck of the vessel at the juncture of sagging service lines.

10. In or about December of 1983, the Navy had designated safety inspectors and quality assurance personnel who worked out of the office of the Supervisor of Shipbuilding, Conversion and Repair [Supship], a United States Naval agency that has offices on Ingalls property in Pascagoula. The Navy's safety inspectors and quality assurance people went aboard the U.S.S. IOWA regularly looking for safety deficiencies according to the testimony of Captain Ristad. Captain Ristad testified that when the Naval safety inspectors and quality assurance personnel observed potential safety hazards for the vessel or Navy personnel, Ingalls was advised of the problem and asked to correct it. Ingalls virtually always eliminated such potential safety hazards at the request of the Navy. The

record does not reflect that the Naval safety inspectors or quality assurance personnel ever observed sagging service lines on the deck of the U.S.S. IOWA. Further, there is no evidence to indicate that the Naval safety inspectors or quality assurance personnel ever observed Ingalls employees placing the carriage on the deck of the U.S.S. IOWA with sagging service lines drooping over the carriage. Finally, there is no testimony placing Naval safety inspectors or quality assurance personnel on board the vessel at any time on December 9, 1983.

11. Mr. Gary Dupree was a joiner supervisor working on the restoration of the U.S.S. IOWA in December of 1983. The plaintiff was in Dupree's crew in December of 1983. Dupree testified that he could not recall any problem with low hanging lines aboard the U.S.S. IOWA. Although, during his years with Ingalls, he had seen riggers push back service lines to make room for a carriage to be placed on the deck of a vessel, Dupree stated that he had never observed such activity on the U.S.S. IOWA and, in fact, had never seen a carriage with drooping service lines draped over it. Dupree testified that although he had observed Bass unloading carriages on several occasions, Bass had never unloaded a carriage with drooping service lines draped over it. Dupree did not see Bass' injury on December 9, 1983. He further stated that he never received any direction or supervision from Navy personnel with respect to his crew's work.

12. Finally, Dupree testified that Ingalls had its own safety department, directed by one John Bleming, working daily on the U.S.S. IOWA and to his knowledge there were never any complaints about low hanging lines. Bass testified that at approximately 2:30 p.m. on December 9, 1983, an unidentified Naval officer on board the U.S.S. IOWA instructed plaintiff's supervisor, Mr. Haney, to have his crew unload a carriage containing cans of tar weighing about sixty-five to seventy pounds each that had been placed on the deck of the U.S.S. IOWA by a crane operated by Ingalls personnel. The carriage was allegedly placed in a location that blocked ingress and egress to the vessel and needed to be emptied and removed from the deck quickly since both Navy personnel and Ingalls crews working on the vessel would execute a shift change at approximately 3:00 p.m. Plaintiff further testified that at the time the carriage was placed on the deck of the U.S.S. IOWA, there was not an area free of service lines in which to place the carriage. Therefore, the service lines were parted by Ingalls personnel so that the carriage could be placed on the deck of the vessel. Once the carriage was so placed, plaintiff claims that the service lines drooped over the entry/exit area of the carriage. Due to the presence of the drooping service lines, plaintiff testified that he was forced to, after picking up two cans of tar, exit the carriage by backing out so that he would not be struck in the face with the lines. Moreover, plaintiff asserted that while exiting the carriage, he had to crouch down with the tar cans to avoid contact with the drooping service lines. Plaintiff stated that he had made several trips to and from the carriage carrying cans of tar before his alleged fall. On the occasion of plaintiff's purported fall, plaintiff testified that due to the unsafe condition created by the drooping service lines aboard the U.S.S. IOWA, he was unable to maintain his balance while exiting the carriage and slipped and fell onto one of the cans of tar severely jolting his back.

13. Although plaintiff testified that other Ingalls employees and Navy personnel witnessed his fall, none of these purported witnesses appeared at trial.

14. Plaintiff stated that after his fall he continued to work until his shift was over on Friday, December 9, 1983, and worked full shifts on the following Saturday and Sunday. Plaintiff testified that he reported for work on Monday, December 12, 1983, at which time he first sought medical attention for his injury supposedly sustained on Friday, December 9, 1983. Plaintiff went to Ingalls shipyard hospital where an accident report form was signed by the plaintiff after he informed a Mr. Strick-

land, an Ingalls safety officer, of the facts and circumstances surrounding his fall.

15. The shipyard physician that attended plaintiff referred him to Dr. Chris Wiggins, an orthopedic surgeon. Dr. Wiggins conducted his initial examination of plaintiff on December 12, 1983, and his initial diagnosis was that plaintiff has suffered a herniated lumbar disc. Dr. Wiggins treated plaintiff conservatively on an out-patient basis without improvement. Plaintiff was hospitalized on December 17, 1983, for further conservative therapy. During his hospitalization, CT scans and myelograms were performed which revealed disc problems at L–3, L–4, and L–5. Dr. Wiggins obtained a consult from Dr. Enger, an orthopedic surgeon, and both Wiggins and Enger determined to continue plaintiff's conservative therapy. Plaintiff was discharged on December 24, 1983, but was advised by his physicians that if his injury failed to respond to the conservative therapy rendered, surgery would be required. Ultimately, plaintiff was re-hospitalized on February 22, 1984, at which time Dr. Enger performed a laminectomy and discectomy at L–5. Plaintiff's in-hospital, post-operative course was unremarkable, and he was discharged on March 1, 1984. Plaintiff unfortunately was hospitalized yet a third time on May 6, 1984, due to a slow developing post-operative infection. Plaintiff's final hospital discharge date was July 22, 1984.

16. Dr. Chris Wiggins testified at trial that although plaintiff had suffered several prior injuries, previously set forth in this Opinion, plaintiff suffered a herniated disc as a result of his alleged December 9, 1983, fall aboard the U.S.S. IOWA and that his prior injuries were in no way related to the herniated disc. Dr. Wiggins' testimony was uncontradicted.

17. The parties stipulated prior to trial that Aetna Casualty and Surety Company [Aetna], Intervenor, has paid medical bills totaling $54,766.57, and compensation benefits totaling $47,700.66 as a result of the injuries received by plaintiff on December 9, 1983.

18. Testimony was tendered at trial indicating that due to his injury of December 9, 1983, Bass is permanently and totally disabled and consequently has suffered a loss of future wages in the amount of $172,378 after taking out taxes and discounting to the present value; a loss of wages from the date of injury to the date of trial of $67,350, after taking out taxes; a loss of future non-marketing services (household chores and repairs) in the amount of $67,947; a loss of non-marketing services from the date of injury to the date of trial of $10,822; and future medical expenses of $13,674.

19. Unrebutted expert testimony elicited at trial established that if there were low hanging or sagging service lines above and around the carriage, this would constitute an unreasonably dangerous condition aboard the U.S.S. IOWA.

### Conclusions of Law

This Court has jurisdiction pursuant to the Public Vessel Act, 46 U.S.C.App. Sections 781–90, for causes of action arising under Section 5(b) of the Longshore and Harbor Workers' Compensation Act [LHWCA], 33 U.S.C. Section 901, *et seq.*

The Supreme Court has outlined the contours of a vessel owner's liability to a longshoreman for injuries sustained aboard the vessel as follows:

First, before the stevedore begins his work, a shipowner must exercise care to make safe the portions of the ship that it turns over to the stevedore. In discharging this duty the ship may rely on the stevedore's performing its task with reasonable care. The shipowner must also warn the stevedore of hidden unsafe conditions on the ship of which the ship is, or should be, aware.

Second, once the stevedore begins its operations, the shipowner has no general duty to supervise work or to inspect the area assigned to the stevedore, unless custom, contract, or law imposes such a duty on the shipowner. The shipowner need not monitor the stevedore's operations; rather, the shipowner is entitled to

rely on the stevedore's expertise and reasonableness.

Third, the Supreme Court made an exception to the general absence of a duty of the shipowner to protect employees of the stevedore during cargo operations. The duty arises when two conditions are fulfilled. *If* the shipowner becomes aware during the stevedore's work that the ship or its gear poses a danger to the longshoremen, and *if* the shipowner also learns that the stevedore is acting unreasonably in failing to protect the longshoremen against the danger, then the shipowner acquires a duty to intervene and protect the longshoremen. The shipowner can have knowledge of a defect if the defect develops during the stevedore's operations and the shipowner has actual knowledge, or if the defect exists at the outset and the ship "must be deemed" to have knowledge of it. (footnotes and citations omitted) (emphasis original).

*Hill v. Texaco, Inc.*, 674 F.2d 447, 451 (5th Cir.1982) (citing *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981)).

The Fifth Circuit has stated that "[t]he rationale of *Scindia* is not limited to stevedoring operations. It clearly applies to any independent contractor and its harborworker employees by the LHWCA and working aboard ship." *Hill*, 674 F.2d at 451.

It is settled in this Circuit that once the vessel owner has surrendered his ship to the longshoreman's employer and repair operations have begun, "the vessel owner can be held liable for injuries to employees of the [contractor] resulting from open and obvious dangers only in the event of actual knowledge of the danger *and* actual knowledge that he cannot rely on the [contractor] to remedy the situation." (emphasis original). *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1038–39 (5th Cir.1983).

■ Further, where an open and obvious danger aboard the vessel does not involve the ship itself, its gear, or equipment but rather arose as a result of a transitory condition created entirely by the contractor, the shipowner has no duty to intervene and correct the hazardous condition simply because it is present on his vessel, and the vessel owner is aware of the existence of the condition. Where the open and obvious hazardous condition is created and used entirely by the contractor and the shipowner has assumed no duty with respect to the hazardous condition, the shipowner has no duty to intervene, even if it possesses the full measure of actual knowledge required by *Helaire*. *Futo v. Lykes Bros. S.S.C., Inc.*, 742 F.2d 209, 218 (5th Cir. 1984).

With respect to the vessel owner's exposure to liability under Section 905(b) where custom, contract, or law has imposed upon the shipowner a duty to supervise the contractor's work or inspect the area assigned to the contractor, the Fifth Circuit has not yet expounded on the breadth and scope of this prong of *Scindia*. However, in *Helaire*, Judge Williams, writing for the Court, seemed to imply that the level of proof necessary to impose liability under this prong of *Scindia* must be clear and convincing that the facts supporting a finding of a duty to supervise or inspect be, "established with *complete certainty* and to such a level that contract, custom or positive law [would make the vessel owner] responsible under the *Scindia* analysis." (emphasis added). *Helaire*, 709 F.2d at 1040.

It has also been observed in this Circuit that knowledge of the hazardous condition must be had at or near the time of injury, *Helaire*, 709 F.2d at 1039, and that "mere presence of the vessel's crew on the ship ... does not prove knowledge of a hazardous condition." *Hill*, 674 F.2d at 450.

■ In light of the fact that the U.S.S. IOWA had been surrendered to Ingalls long before December 9, 1983, and that the sagging service lines on the deck of the U.S.S. IOWA were not part of the vessel, its gear, or equipment, but rather an open and obvious hazardous condition created and owned by Ingalls and used by Ingalls employees, the United States can *only* be held liable for Bass' injury and resultant damages if through contract, custom, or positive law the Navy undertook responsi-

bility for insuring the safety of the Ingalls' crew's working space on board the U.S.S. IOWA. *Futo,* 742 F.2d at 221.

Contract No. N00024–82–C–2115 does not specifically allocate responsibility for the maintenance and supervision of a safe working area for Ingalls employees; however, Section H–4 of the contract specifically states that the contractor, Ingalls, remains obligated to comply with the Occupational Safety and Health Standards for Ship Repairing, 29 C.F.R. Part 1915. The Court recognizes that 29 C.F.R. Part 1915 has been interpreted as not relieving any owners of vessels from responsibilities or duties imposed upon them by law, regulation, or custom. *See Woodruff v. United States,* 710 F.2d 128, 131 & n. 7 (4th Cir. 1983). However, it seems clear in construing the contract as a whole that Section H–4 was inserted in the contract to place principle contractual responsibility for the safety of Ingalls workers on Ingalls. The obvious intent of the parties in including Section H–4 in the contract was to dispel the possibility that the Navy could be construed as having assumed under the contract any responsibility for the safety of Ingalls employees.

Plaintiff makes much of the fact that the Navy had safety inspectors and quality assurance personnel assigned to the U.S.S. IOWA in an effort to establish liability by custom or practice. Unfortunately, Captain Ristad's testimony stands unrebutted and sounds totally believable that the Naval safety inspectors and quality assurance personnel periodically checked safety measures on the U.S.S. IOWA *not* for the benefit of Ingalls employees, but for the protection of Naval property, the vessel, and the Navy personnel assigned to the U.S.S. IOWA. *Cf. Woodruff v. United States,* 710 F.2d 128, 130 (4th Circuit, 1983) (the United States was found liable for injuries suffered by a ship repairer where the evidence established that the plaintiff's injuries were due to the absence of safety nets which the Navy had designed in their plans when they built the ship, thus the injury in *Woodruff,* unlike the instant case, was due to a defect in the ship's gear or equipment which the vessel owner under

*Scindia* is generally under a positive legal duty to guard against; *Woodruff* did not involve a duty to inspect or intervene in the ship repair operations).

Finally, the fact that Ingalls, according to Dupree's testimony, maintained its own safety inspections assigned to the U.S.S. IOWA, lends further support to the conclusion that Ingalls understood under the contract and through custom and policy that it was responsible for insuring the safety of its employees.

Final judgment should be entered in this cause in favor of the United States of America. Counsel for the defendant shall submit a judgment in conformity with the foregoing Opinion within ten days from the date of entry hereof.