Victor CAMERON,

v.

UNITED STATES of America
and Apex Marine Crew
Management Co., Ltd.

No. Civ.A. G–99–511.

United States District Court,
S.D. Texas,
Galveston Division.

March 20, 2001.

the M/V CAPE TRINITY, against Defendant United States of America, principal for Apex Marine Crew Management Co., Ltd. ("Apex"). Plaintiff filed this case alleging that as a result of the United States' negligence and the unseaworthiness of the M/V CAPE TRINITY, he sustained neck, low-back, and wrist injuries when he fell down a stairwell leading from the vessel's engine room in the early morning hours of March 28, 1999. Defendant admits that Plaintiff fell aboard its vessel, but denies that Plaintiff suffered anything more than a wrist injury.

Richard Lee Melancon, Melancon and Hogue, Friendswood, TX, for Victor Cameron, plaintiff.

Peter Glenn Myer, U.S. Dept of Justice, Civil Division, Washington, DC, for United States of America, defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

This cause came on for a non-jury trial in August, 2000, the Honorable Samuel B. Kent presiding. Having considered all pleadings on file, the Pre–Trial Order, the evidence and testimony submitted into the Record, all post-trial submissions, and the applicable law, pursuant to Rule 58, of the Fed.R.Civ.P., the Court hereby enters its Findings of Fact and Conclusions of Law.

### I.

### NATURE OF THE CASE

1. This is a Suits in Admiralty Act, Jones Act, and general maritime law action brought by Victor Cameron, . a seaman working in the engine department aboard

### II.

### PARTIES AND JURISDICTION

1. Plaintiff alleges that on March 28, 1999, the crew and officers of the M/V CAPE TRINITY, including Plaintiff himself, were in the employ of Apex, and that Apex owned and operated the M/V CAPE TRINITY. Plaintiff alleges that Apex is an agent of the United States, and the United States is the proper party in this case pursuant to the Suits in Admiralty Act.

2. The Defendant does not dispute these contentions. Thus, the Court finds that with regard to Plaintiff's March 28, 1999 accident, the United States is the proper party defendant in this case.

3. The Court finds this case is properly brought within its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1331 et seq. The Court finds that it has jurisdiction over all of the parties, and that proper venue for this suit is in this District and before this Court.

### III.

### LIABILITY

A. Summary of Proceedings and Claims Asserted.

1. Plaintiff commenced this suit on August 18, 1999 against the United States,

alleging claims under the Jones Act, 46 U.S.C.App. § 688, claims under the Suits in Admiralty Act, 46 U.S.C.App. § 741, and claims for unseaworthiness of the M/V CAPE TRINITY under the general maritime law. Mr. Cameron alleged that on March 28, 1999 he slipped and fell down a stairwell leading from the engine room, while he was attempting to assess the damage and begin cleanup of a massive fuel oil spill. Mr. Cameron alleged that as a result of his fall, he sustained injuries to his right wrist, to his neck and to his low back.

## B. Evidence Reviewed and Resulting Findings.

1. Mr. Cameron is a thirty-four year old African–American man from the Houston, Texas area. He completed the eleventh grade. He began going to sea in 1990, and has been shipping primarily in the engine department since that time. The Court finds that Mr. Cameron has substantial experience aboard numerous sea-going vessels.

2. Mr. Cameron joined the CAPE TRINITY as a "GUDE" in Houston, Texas in October of 1998. Mr. Cameron was hired as a permanent employee.

3. At approximately 4:30 a.m. on the morning of March 28, 1999, Mr. Cameron was awakened and told to come immediately to the engine room. When he arrived at the engine room, Mr. Cameron learned that the vessel had experienced a fuel oil leak, and that he was needed to assist in the cleanup. Oil was all over the engine room, and covered the engine room stairs. Chief Engineer John Loman ordered Mr. Cameron to go below to assess the damage, and to begin cleanup of the spill.

4. It is essentially undisputed that the stairwell lacked non-skid on the steps and the handrails. It is undisputed that the stairwell, including the steps and handrails, was covered with fuel oil. It is undisputed that the vessel was rolling. It was not disputed at trial that the cleaning supplies, including the hose, needed to begin the cleanup were on the bottom-level of the engine room, one floor below. It was not disputed at trial that the stairwell was the only way to get down to the bottom-level of the engine room to assess the damage and begin the cleanup.

5. As Mr. Cameron attempted to take the engine room stairwell to go below as ordered, the vessel rolled, and his foot slipped off the stair step, and he fell down the flight of stairs, somersaulting on the way down. After lying there for approximately two minutes, Mr. Cameron retrieved the hose and began the cleanup. His wrist was hurting badly from having banged it on the handrail. His neck and back were hurting to a lesser degree, but he made no immediate complaint.

6. Defendant does not dispute that Cameron fell as alleged. Defendant did not quarrel with Plaintiff's allegation that he was rushed in his cleanup efforts by the Chief Engineer. Further, the Court finds that Plaintiff was a credible witness. The Court thus finds, by a preponderance of the evidence, that Plaintiff indeed fell in the manner he testified about at trial.

7. With regard to the non-skid, or lack thereof, on the ladder steps and handrails, the Court finds, from the pictures presented at trial, and from the Defendant's presentation at trial, that the ladder's steps and handrails lack any substance to prevent an individual from slipping. The pictures also reveal, consistent with Plaintiff's testimony, that the steps and handrails are covered with a thick, enamel paint. As mentioned above, it is undisputed that the stairwell was covered with fuel oil at the time of Plaintiff's fall.

The Court thus finds that the ladder steps and handrails were unseaworthy, and in part proximately caused Plaintiff's fall. The Court further finds that Defendant, under the circumstances, was negligent in the way in which it ordered Plaintiff to clean up the spill, and that such negligence was a cause in part of Plaintiff's injuries.

8. Defendant contends that the primary duty doctrine, recognized by the Second Circuit in *Walker v. Lykes Brothers S.S. Co.*, 193 F.2d 772 (2d Cir.1952), barred any recovery by Plaintiff. Defendant's contention flies directly in the face of voluminous caselaw. The Primary Duty Doctrine applies only to supervisory employees. *See, e.g., Boudreaux v. Sea Drilling Corp.*, 427 F.2d 1160, 1161 (5th Cir. 1970); *see also Villers Seafood Co. v. Vest*, 813 F.2d 339 (11th Cir.1987) (noting that the primary duty doctrine applies only to ship officers who are charged with the duty of maintaining the ship). It is undisputed that Plaintiff was not a supervisory employee. Even if the Primary Duty Doctrine applied, current caselaw instructs that the factfinder should endeavor to apportion responsibility for the injury. Defendant's contention is a veiled attempt to hide behind the assumption of the risk defense. It is well established that assumption of the risk is no longer a valid defense in admiralty actions. *See, e.g., Pickle v. International Oilfield Divers, Inc.*, 791 F.2d 1237 (5th Cir.1986).

9. Defendant further argued at trial that Plaintiff was contributorily negligent because, according to Defendant, Plaintiff should have begun the fuel-oil cleanup at the top of the stairs, and should have been more careful in descending the stairs then covered with oil. The Court disagrees with the first contention, but agrees with the second. Plaintiff testified that he was *ordered* to go below to the bottom-level of the engine room to assess the damage. Plaintiff's testimony was not challenged. And Defendant did not dispute that the only way to get below to assess the damage was to take the stairwell—the stairwell that Plaintiff fell down. Second, Plaintiff testified that the required cleaning supplies were down below, on the bottom-level of the engine room. Again, the only way to get the cleaning supplies to begin the cleanup as ordered was to take the stairwell. However, he testified that he knew the stairs were covered with oil, yet took no special precautions as he descended. The Court therefore finds that his own negligence was also a cause, in part, of Plaintiff's injuries.

10. The preponderance of the evidence supports and the Court finds (and will hereinafter conclude) that Mr. Cameron indeed fell down the stairwell on March 28, 1999, and that the cause of Mr. Camerons's fall was 66% the Defendant's negligence in failing to provide a safe place to work and the unseaworthiness of the vessel, and 34% the negligence of Plaintiff, himself. The Court thus finds the Defendant and the vessel 66% liable for Plaintiff's stated losses.

## IV.

### EVIDENCE ON MEDICAL CAUSATION, CURE AND FUTURE MEDICAL

1. Dr. Bruce Weiner, the Defendant's IME doctor, was recognized as an expert by the Court under Rule 702. Dr. Weiner saw Plaintiff once, in February of 2000. Dr. Weiner diagnosed Plaintiff with neck and back pain. Dr. Weiner found what he believed to be "changes" on Plaintiff's cervical MRI films, and admitted that the changes could be causing Plaintiff pain. Dr. Weiner disagreed with board-certified radiologist Dr. Barry Wood, who found

that Plaintiff had spinal cord encroachment in his neck. Dr. Weiner testified that the cyst ultimately removed from Plaintiff's wrist could have been caused by trauma, but opined that Plaintiff's neck and back problems were not related to Plaintiff's March 28, 1999 fall. This is hardly surprising. Dr. Weiner has testified numerous times in behalf of Defendants before this Court and is always exceedingly conservative in his findings.

2. Dr. James A. Ghadially is Plaintiff's treating physician and was also recognized by the Court as an expert under Rule 702. Dr. Ghadially first saw Plaintiff two weeks after his accident. Dr. Ghadially opined that, in all reasonable medical probability, Plaintiff's fall down the stairwell on March 28, 1999 caused Plaintiff to suffer injuries to his wrist, neck, and low back. Dr. Ghadially opined that Plaintiff was suffering from encroachment in his neck, which resulted from the March 28, 1999 fall. Dr. Ghadially opined that Plaintiff was too young for the changes in his back to be merely a result of degeneration and age. Dr. Ghadially also noted that it is not uncommon for a patient to fail to report pain in his neck and back until weeks later, even when the neck and back pain indicates an operable neck or back condition. Dr. Ghadially further testified that all of the tests and studies performed on Plaintiff, including MRI and discograms, consistently indicated encroachment in Plaintiff's neck.

3. Because of the fall, Plaintiff underwent a right wrist arthroscopy and an excision of the post-traumatic ganglion cyst in his wrist. Plaintiff's fall also necessitated a four-level laminectomy, which Plaintiff underwent in May of 2000. Dr. Ghadially testified that he is familiar with the cost of medical treatment in the greater-Houston area. Dr. Ghadially further testified in reasonable medical probability that Plaintiff would need a fusion in his neck, at a cost of approximately $75,000. Dr. Ghadially also testified that Plaintiff would need attendant care and prescriptions as a result of his neck surgery in the amount of approximately $6,000 to $ $10,-000 for rehabilitation, with approximately $1,000 to $1,500 for the two years following the May 2000 surgery, and an additional $500 per year needed for prescriptions over the next 40.9 years of Plaintiff's life. Dr. Ghadially testified that Plaintiff should be restricted to sedentary or light duty for life as a result of the fall, and that Plaintiff will never be physically able to return to sea. The Court finds Dr. Ghadially's testimony largely persuasive, although a long history of testimony in this Court has shown him to be remarkably sympathetic to those he treats.

◼ 4. With regard to Mr. Cameron's medical bills, Dr. Ghadially testified that, being familiar with the charges for such services in the greater-Houston area, his own bill of $30,894.00, the bill in the amount of $1,537.69 from Gulf Coast Pharmacy, the bill of $13,836.00 from Downtown Plaza Imaging, the bills of $7,834.73, $2,615.46, $2,657.08, $2,694.97, $2,756.66, $3,223.20, and $3,258.74 from East Side Surgery Center, the bill for $860.00 from Texas Imaging & Diagnostic, the bill of $29.75 from Brown & Associates Medical laboratory, L.L.P., the bills of $3,575.00 and $1,695.00 from U.S. Anesthetic Services, P.A., the bill of $455.00 from Pasadena Anesthesiology Consultants, and the bill of $19,482.25 from Bayou City Medical Center were reasonable and necessary expenses for medical cure incurred by Plaintiff and were necessary as a result of his fall aboard the CAPE TRINITY on March 28, 1999. In view of the totality of the evidence, the Court agrees and so finds, and concludes that Plaintiff should be awarded such amounts as cure. Such

amounts, constituting cure, are not offset by Plaintiff's negligence. The Court further finds that Plaintiff is entitled to future medical damages, for his future surgery and attendant care, in the amount of $55,000.00, which, again, is not offset by Plaintiff's negligence. Plaintiff's past medical bills total $97,405 .53, but Defendant has paid $53,635.41. Defendant is entitled to a credit and off-set for that amount. The Court therefore finds Defendant liable for past and future medical expenses totaling $98,770.12.

5. Defendant conceded that Plaintiff suffered a wrist injury, and that Plaintiff reasonably underwent a wrist operation in May of 1999 to remove a ganglion cyst. Defendant contended, however, that Plaintiff did not report his neck and back pain until two weeks after the accident, and, therefore, Plaintiff did not really injure his back and neck during the fall. Contrary to Defendant's position, Plaintiff offered the *uncontradicted* testimony of Reginald Abrahms. Mr. Abrahms, like Plaintiff, worked in the engine room on the CAPE TRINITY. Plaintiff testified that he barely knew Mr. Abrahms, was not friends with him, and had not seen him since leaving the vessel. Plaintiff testified that he told Mr. Abrahms on several occasions after the fall that his neck and back hurt. Plaintiff testified that Abrahms told him to report the accident, but Plaintiff was concerned about losing his job. Mr. Abrahms confirmed Plaintiff's testimony. Indeed, he stated under oath that Plaintiff had told him almost every day from March 28, 1999 until Plaintiff left the vessel that his neck and back were hurting. The Court finds Mr. Abrahms' testimony credible.

6. Plaintiff saw Dr. Ghadially approximately two weeks after his accident. Plaintiff went to Dr. Ghadially because his neck and back pain did not go away and because his wife admonished him to do so. Plaintiff's primary complaint to Dr. Ghadially was neck and back pain. Plaintiff testified at trial that there were three reasons he told no one beyond Mr. Abrahms about his neck and back pain until he saw Dr. Ghadially on April 14,1999. First, and most simply, Plaintiff's neck and back were not hurting that badly after the fall. Immediately after the fall, Plaintiff's wrist was hurting more than any other part of his body. It was only later when his neck and back pain did not subside, but instead grew worse, that Plaintiff began to worry and decided to seek medical attention. Second, Plaintiff did not want to lose his job; his wife was nine months pregnant at the time, the job did not require a lot of sea time, and the vessel was stationed in his home town. Third, Plaintiff liked and respected the officers on the vessel. He knew what people thought of complainers, and did not want to be considered one. The Court finds these representations credible.

7. The medical tests and studies objectively showed encroachment in Plaintiff's cervical spine. Even Defendant's IME doctor, Dr. Weiner, admitted that there were "changes" in Plaintiff's cervical spine, and that these changes could be causing him pain. Plaintiff underwent and passed an extensive physical before beginning his work with Defendant. Absolutely no evidence was offered that Plaintiff had neck or back pain before his accident of March 28, 1999. No evidence was offered of any other accidents. Plaintiff continued to complain of neck and back pain up to and after his May 2000 neck surgery. After conservative care failed to correct his neck problems, Plaintiff underwent a four-level laminectomy on May 8, 2000. This is serious surgery which the Court firmly believes no one would undergo in the absence of severe and legitimate complaints.

8. The Court is not persuaded by Defendant's referral physician that the surgical neck condition in Plaintiff's neck was the result solely of degeneration. The evidence is undisputed that Mr. Cameron was working at full duty without any complaints or limitation, and was earning an average of over $26,000.00 per year gross in the two full calendar years prior to the accident at issue. Plaintiff testified that he underwent an extensive physical prior to accepting employment with Defendant, and further testified that he had no neck or back pain whatsoever prior to his March 28, 1999 accident. The Court also considers that Dr. Weiner, who is not a radiologist, disagreed inexplicably with the findings of a board-certified radiologist. The Court is inclined to accept the film interpretation of a board certified radiologist, rather than an IME doctor who examined Plaintiff on only one occasion. Perhaps most importantly, Dr. Weiner agreed that the "changes" in Plaintiff's spine could be causing him pain, and he could not offer any evidence of any other accidents which may have brought about this pain. Viewing the totality of the medical and work history evidence, the Court finds and concludes that, in all reasonable medical and legal probability, Mr. Cameron's neck and wrist injuries were the legal and proximate result of his fall aboard the M/V CAPE TRINITY, which in turn the Court finds and concludes was legally and proximately caused 66% by the Defendant's negligence and the unseaworthiness of that vessel.

## V.

### *ECONOMIC DAMAGES*

1. The Court recognized Dr. Kenneth G. McCoin, Plaintiff's economist, as an expert in evaluation of economic loss pursuant to Rule 702. The Court finds, based upon the testimony of Dr. McCoin, using the standards of *Culver II* and its progeny, and based on the evidence before the Court, that Plaintiff has sustained past and future economic losses, inclusive of lost wages and fringe benefits.

2. Dr. McCoin testified that, based on U.S. Government Life Tables, Plaintiff had a work life expectancy of 24.5 years, and a life expectancy of 40.9 years as of July 26, 2000. Dr. McCoin further testified that Plaintiff had averaged $26,483.00 in gross wages for the years 1996, 1997, and 1998, expressed in 1998 dollars, and deducting for Social Security payments and income taxes. To calculate future losses, Dr. McCoin used a below-market discount rate of one and one-half percent below average, as mandated by *Culver II*.

3. Dr. McCoin calculated that Plaintiff sustained in past lost wages approximately $29,000.00 at the time of trial. Dr. McCoin also testified that Plaintiff will suffer, and has suffered, past and future economic losses totaling $497,000.00, assuming Plaintiff begins working in December 2000 at an $5.50 per hour job. Dr. McCoin's figure includes approximately $28,539.00 in lost household services. The Defendant presented no live economic testimony. The Defendant offered, over objection, the report of Economist Kenneth Boudreaux. Dr. Boudreaux opined that Plaintiff would be able to return to his normal working duties in November 2000, and had therefore only lost approximately $35,600.00. The Court finds no basis for Dr. Boudreaux's assumption that Plaintiff will be able to return to full duty in November of 2000. To the contrary, his treating physician, Dr. Ghadially, opined that Plaintiff will never return to sea, but instead will be relegated to light or sedentary jobs. The Court finds Dr. McCoin's testimony largely persuasive. The Court finds and concludes that Plaintiff has sustained economic losses, past and future, as

a legal and proximate result of Defendant's negligence and the unseaworthiness of the vessel in the amount of $379,000.00, for which Defendants are 66% liable. Defendant is therefore liable for $250,140.00 in economic losses.

■■■■ 4. Based on the totality of the evidence in this case, the Court further finds that the Plaintiff has sustained the following losses by a preponderance of the evidence, in addition to past and future wage related losses found above. Defendant United States of America, as the principal of the owner, operator, and employer of the crew of the M/V CAPE TRINITY, is 66% liable for the following:

a.  for the physical pain, mental anguish, and suffering sustained by Victor Cameron from his injuries on March 28, 1999 and through the time of trial, the amount of $150,000.00, or net liability of $100,000.00;

b.  for the physical pain, mental anguish, and suffering sustained by Victor Cameron from his injuries on March 28, 1999 and through the end of his life expectancy of 40.9 years at the time at trial, the amount of $200,000.00, or net liability of $132,000.00; and

c.  for past unpaid cure in the amount of $43,770.12 and future medical in the amount of $55,000.00. Thus Defendant's total liability equals $580,910.12.

## VI.

### PRE–JUDGMENT INTEREST

■■■ 1. Under maritime law, the awarding of pre-judgment interest is the rule rather than the exception, and, in practice, well-nigh automatic. *Reeled Tubing, Inc. v. M/V CHAD G,* 794 F.2d 1026, 1028 (5th Cir.1986). This rule applies equally to Jones Act claims brought under the Court's admiralty jurisdiction. *Williams v. Reading & Bates Drilling Co.,* 750 F.2d 487, 490 (5th Cir.1985). A Trial Court only has the discretion to deny prejudgment interest where the peculiar circumstances would make such an award inequitable. *See id.* In this Circuit, prejudgment interest is usually awarded to the date of loss to ensure that the injured Plaintiff is compensated for the use of funds to which the Plaintiff was entitled, but which the Defendant had use of prior to Judgment. *See Reeled Tubing, Inc.,* 794 F.2d at 1028.

■■■ 2. The Court also has broad discretion in setting the rate of pre-judgment interest. *See Reeled Tubing, Inc.,* 794 F.2d at 1029. In setting the rate of pre-judgment interest as to past damages, the Court appropriately may look to reasonable guideposts, including the interest rates set forth in 28 U.S.C. § 1961 for judgments. *See id.* The Court finds the most equitable rate of pre-judgment interest would be 6.0%. Accordingly, the Court finds and awards on all damages accrued through the entry of Judgment pre-judgment interest at that rate, which equals $34,800.00.

## VII.

### CONCLUSIONS OF LAW

1. The Court concludes that this is a case of admiralty and maritime jurisdiction. The Court concludes that, pursuant to the Suits in Admiralty Act, the United States of America is the proper party defendant.

2. At the time of his injury on March 28, 1999, the Court concludes that Victor Cameron was a "seaman" as that term is legally defined under the Jones Act, and

was employed by Apex, as agent for Defendant United States of America.

3. The Court concludes the injuries sustained by Plaintiff Victor Cameron were proximately caused 66% by the negligence of Defendant in failing to provide a safe place to work and the unseaworthiness of the M/V CAPE TRINITY. The Court finds that Defendant the United States is the proper party responsible for the unseaworthiness of the M/V CAPE TRINITY. The negligence and unseaworthiness were each and both a legal and proximate cause of Plaintiff's injuries. The Court further finds that Plaintiff's negligence was 34% a proximate cause of his own injuries.

4. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court hereby adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court hereby adopts it as such.

5. For reasons set out in the Court's Findings of Fact and Conclusions of Law, and pursuant to Rule 58 of the Fed.R.Civ. P., Judgment is hereby rendered in favor of Plaintiff on his stated claims against Defendant. Therefore, Plaintiff Victor Cameron, shall have and recover of and from Defendant United States of America, the total amount of $580,910.12, plus taxable costs of court and pre-judgment interest in the amount of $34,800.00, and post-judgment interest at the rate of 6.0% per annum, for which execution shall issue if not timely paid.

IT IS SO ORDERED.