Candelaria C. PONCE, as Personal Representative for the Estate of Abelino Ponce, Deceased; Able Ponce, Naomi Ponce, Individually and as Next Friend of Son, Joel Eugene Ponce, a Minor Child; Candelaria Martinez, Individually and as Next Friend of Son, Abel Rene Ponce, a Minor Child; Jose Ponce; Arthur Ponce; Juan Ponce; and Paula Gomez Ponce, Plaintiffs

v.

M/V ALTAIR, her engines, boilers, tackle, apparel, etc., in rem; and Scarlati Ventures, Inc. and B Navi Spa, in personam, Defendants.

No. C.A. G–05–539.

United States District Court,
S.D. Texas,
Galveston Division.

June 7, 2007.

Guy Lee Womack, Attorney at Law, Douglas Travis Gilman, Gilman & Allison, Houston, TX, for Plaintiffs.

David R. Walker, Royston Rayzor et al, Houston, TX, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAMUEL B. KENT, District Judge.

This case was tried to an advisory jury panel on October 16, 2006, with the Honorable Samuel B. Kent presiding. Having carefully considered all the trial testimony, exhibits, pleadings, credibility of each witness, the jury's recommended findings and verdict, and all post-trial submissions, particularly including the proposed findings of fact and conclusions of law from both sides, the Court hereby enters its Findings of Fact and Conclusions of Law.

## I.

## FINDINGS OF FACT

### A. Nature of the Case

1. This wrongful death and survival case centers on the October 4, 2005 fatality of Mr. Abelino Ponce ("Ponce"), a 56-year-old longshoreman killed while working aboard the M/V ALTAIR [1] in the Port of Houston. Mr. Ponce was operating the vessel's No. 1 cargo boom and unbeknownst to Mr. Ponce, the boom was missing a wire runner guide. The missing runner guide allowed the wire runner to excessively slacken and "catch" or snag on a make-shift "step" that had been welded to equipment underneath the boom. While standing at the winch controls, with the boom in operation, the wire runner broke free from the "step", causing it to slash across the winch operation platform, striking Ponce from behind. Ponce was thrown violently several feet in the air, landing on his head and causing fatal injuries.

2. Within 24-hours of the accident, Plaintiffs initiated this action against the M/V ALTAIR *in rem* alleging that the premature and untimely death of Mr. Ponce occurred as a result of vessel negligence in failing to discharge the duties prescribed under 33 U.S.C. § 905(b)—consistent with standards articulated in *Scindia Steam Navigation Co. v. De Los Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) and its progeny. The same day, Plaintiffs perfected arrest of the M/V ALTAIR, and conducted an on-board inspection prior to releasing the vessel for departure.[2] On November 28, 2005, Plaintiffs amended their pleadings to add the vessel's owner and operator, Scarlati Ventures, Inc. and B Navi SpA, respectively, as Defendants to this suit.

### B. Jurisdiction and Venue

3. With the exception of Paula Gomez Ponce,[3] Plaintiffs are all Texas citizens residing within the Southern District of Texas. On the morning in question, Ponce was working as a longshoreman employed by Americargo Transport ("Americargo") on the Defendants' vessel. The M/V ALTAIR, having previously called upon this District on other occasions, was docked alongside the New Terminal Warehouse facility located at 1 Wharf Street, Houston, Texas 77012, within this Court's jurisdiction. In connection with the arrest, Defendants' P & I insurer, Steamship Mutual

---

1. The M/V ALTAIR, IMO 7813602, Call Sign 3FMD7, is a Panamanian-flag general cargo carrier of 16,235 gross tons built in 1979.

2. Plaintiffs also attended a hearing before The Honorable Calvin Botley, U.S. Magistrate Judge, which resulted in Defendants' P & I insurer, Steamship Mutual Underwriting Association (Bermuda), issuing a Letter of Undertaking in the amount of $3,000,000.00 USD as security for the vessel's release.

3. The Deceased's mother, Paula Gomez Ponce, is a foreign citizen residing in Reynosa, Mexico.

Underwriting Association (Bermuda) ("Claimant"), posted a Letter of Undertaking as security for the vessel's release. Claimant subsequently executed waivers of service and answered on behalf of Defendants herein.

4. The Court finds that this case is properly brought within its admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333, *et seq.* The Court further finds that it has jurisdiction over all of the parties, and that proper venue for this suit is in this District and before this Court.

## C. Factual Background and Liability

### 1. *Claims Asserted*

5. Plaintiffs have brought this suit pursuant to 33 U.S.C. § 905(b) against the M/V ALTAIR, Scarlati Ventures, Inc., and B Navi SpA (collectively "Defendants") alleging Defendants are jointly and severally liable and accountable for the untimely death of Ponce by reason of negligent acts or omissions committed by the vessel, her agents, representatives or employees.

6. In their pleadings, Plaintiffs state that while Mr. Ponce was operating the cargo boom on the morning of October 4, 2005, the hoist wire running along the bottom of the boom became slack, and snagged on a "step" welded to the forward winch housing in the path of the boom's travel while being swung over the starboard side of the ship. Plaintiffs allege that the hoist wire was allowed to develop slack, deviate from its intended path along the bottom of the boom, and become snagged because the vessel's cargo gear was missing a runner guard/guide. Further, Plaintiffs argue that in watching the signalman (or the load), Mr. Ponce would not have noticed the wire runner snagging on the winch to his right, behind him, because he was required to exclusively focus on either the signalman or the load at all times.

7. Plaintiffs contend that while attempting to lift a load of cargo out from Hatch No. 2, the hoist wire became taught and sprung into Ponce standing at the controls—who, unfortunately, was caught directly in the bight of the wire. Plaintiffs allege Mr. Ponce was caused to be flung some 15 to 20 feet into the air and 40 to 60 feet over to the port-side upon coming into contact with the flailing wire. Accordingly, Plaintiffs suggest the initial blows experienced by Ponce were not fatal, and that he survived a period of seconds—both on the ground and in the air—prior to succumbing to his injuries and, therefore, was caused to sustain certain conscious pain and suffering.

### 2. *Evidence Reviewed and Findings*

8. Abelino Ponce ["Ponce"] was born on October 27, 1946. Ponce worked on the waterfront as a longshoreman for over 30 years for various stevedore companies. Ponce was trained and had operated ships' cranes and gear on many occasions prior to his death on October 4, 2005. At the time of his death, Ponce earned approximately $30,000 per year.

9. Ponce is survived by his wife, Candelaria C. Ponce, his two adopted minor grandsons, Joel Eugene Ponce and Abel Rene Ponce, and his mother, Paula Gomez Ponce. Joel, Abel and Paula were completely dependent upon Ponce for financial support. Ponce is also survived by five adult children, Abel Ponce, Jose Ponce, Arthur Ponce, Candelaria Martinez, and Naomi Ponce, who all received limited and sporadic financial support and services from Ponce in varying amounts, with the exception of Abel Ponce.

10. On the morning of October 4, 2005, Ponce, a longshoreman employed by Americargo arrived at work approximately 35 to 40 minutes after 7:00 a.m. to commence discharging operations on board the M/V

ALTAIR. The M/V ALTAIR was owned by Scarlati Ventures and operated by B Navi SpA. At the time of the incident, the vessel was moored alongside the New Terminal Warehouse facility in Houston, Texas. The witness testimony and evidence indicate, and the Court agrees, that the M/V ALTAIR was an old ship, in remarkably poor condition, and not well maintained. In maritime parlance, it was a "rust bucket." Ponce was part of a 5-member longshore gang responsible for discharging a cargo of steel from the vessel's Hatch No. 2. There were three longshoremen working inside Hatch No. 2, and Ponce was operating the vessel's cargo boom. Another served as a flagger.

11. At or about 8:00 a.m., and prior to commencing cargo discharge operations, Ponce swung the cargo boom over the inshore side of the vessel to pick-up a loading tray from the dock. The controls for the cargo boom were located on the mast house of the vessel, amidships at the aft side of Hatch No. 2, so that the crane operator could see into Hatch No. 2. The cargo boom being utilized for the cargo discharge operations was located aft of the controls and Ponce. At the time of the accident, the ship was in light condition and high in the water, making it impossible for Ponce to see the loading tray on the dock and requiring Ponce to rely on a flag-man to retrieve the loading tray.

12. To aid the Court in explaining the sequence of events, the Plaintiffs created a computer animation of the incident. The Plaintiffs' liability expert, Eustis John Faulk, confirmed that the animation was to scale based upon the vessel's plans, witness testimony, Houston Police Department reports, and the Coroner's reports. Mr. Faulk testified that he viewed the animation and that it reasonably and accurately portrays the accident as he believed it occurred. The Court recognizes Eustis John Faulk, Plaintiffs' liability expert, as a properly qualified expert in longshore operations and cargo safety pursuant to Rule 702 of the Federal Rules of Evidence. The Court finds Mr. Faulk's testimony credible and unbiased as to the sequence of events and cause of the accident. Despite the Defendants' well presented objections to the contrary, the Court also finds that the computer animated recreation of the sequence of events is to scale and an accurate depiction of the incident based upon the evidence. The Court finds it was not improperly inflammatory and that its probative value clearly outweighs any improperly prejudicial effect.

13. Mr. Faulk testified that while the cargo boom was swung-out over the dock, the crane hook and load were out of Ponce's view, requiring him to entirely rely upon a flag-man, who was located on the dock for directing and guiding the load. Due to the height of the vessel above the dock, the flag-man positioned himself on the dock in clear view so that Ponce could see his hand signals. As Ponce swung the boom over the dock and lowered the cargo hook to retrieve the loading tray, the boom's hoist wire slacked. Mr. Faulk testified that the cargo boom was supposed to be equipped with wire runner guides to hold the wire runner alongside the edge of the boom to prevent it from sagging when there is no tension. The vessel's plans also indicate there should be a wire runner guide on the cargo boom. Unbeknownst to Ponce and the stevedore, the cargo boom was missing a wire runner guide, which had corroded off and never been repaired or replaced, which allowed the hoist wire to excessively sag and become hung-up on a make-shift "step" welded to the starboard side forward winch housing located directly below the boom. The boom and winch were behind Ponce and not in his direct view or line of sight. Richard Legrand, Ponce's supervisor, testified that in taking signals

from the flag-man and subsequently watching the load in front of him while swinging the boom over to the starboard or on-shore side of the vessel, the boom was "sloppy" and required Ponce to correct the swinging. This required his full concentration. As Ponce lowered the tray to the dock, the hoisting wire became excessively slack. Ponce, however, did not see that the unrestrained hoist wire had become hung on the winch "step" behind him. This was expressly confirmed by the testimony of eyewitness Mr. Faulk and Mr. Legrand.

14. Once the loading tray cleared the starboard side of the vessel, it was in clear view of Ponce and he took control of its movement over Hatch No. 2 as he was trained and is the customary practice by longshoremen. Specifically, Mr. Faulk and Mr. Legrand testified, and the Court believes, that a longshoreman must focus on the load at all times when it is in clear view. To do otherwise would be a dereliction of his duties to those in the hold. The witness testimony establishes that once Ponce centered the loading tray over Hatch No. 2, he lowered the tray down into the hatch so that the longshoremen working inside the hatch could load it with the steel cargo. From his position at the controls, Ponce could see the area in Hatch No. 2 where the loading tray was to be landed and loaded by the longshoremen working in the hatch. The Court finds Mr. Faulk's and Mr. Legrand's testimony credible that while the tray was being loaded in Hatch No. 2, Ponce, as he was trained and is customary practice by longshoreman, continued to watch the tray and cargo hook. Additionally, the Court finds persuasive Mr. Legrand's testimony that Ponce was an experienced longshoreman and was not in any way at fault for not looking around at his surroundings while the cargo of steel was being loaded onto the tray inside Hatch No. 2.

15. Once the longshoremen completed loading the tray with cargo, they signaled Ponce to lift the tray of cargo from the hatch. As Ponce hoisted the loaded tray from Hatch No. 2, he focused on the load. However, when the wire hoist line became taught with the weight of the load, the wire came free from where it had snagged on the "step." As a result, while standing at the controls, Ponce was caught directly in the bight of the wire. The Court finds credible and accepts Mr. Faulk's testimony that the missing wire runner guide directly and completely caused Ponce's untimely death and that there was no operational reason whatsoever for the cargo boom to not have a wire runner guide. The Court also finds credible Mr. Faulk's testimony that Ponce would not have noticed the missing wire runner guide or the snagged wire runner. The missing guide constitutes negligence on the part of the vessel and Defendants.

16. The testimony of another eye witness to the accident, Rissell Mendoza, confirmed that when the hoist wire came free from the "step," Ponce was struck in his right side and was suddenly and violently thrown approximately ten (10) feet in the air and fifteen (15) feet over to the far port side of the mast house. This testimony is supported by the Houston Police Department and coroner's reports and photographs. (Exs. 1 and 50). The Court finds that the initial blows experienced by Ponce were not fatal and he survived for a few seconds, both on the ground and in the air, prior to succumbing to his injuries.

17. In stark contrast to Plaintiffs' liability expert, who the Court notes testified on behalf of a plaintiff in a personal injury case for the first time in his extensive professional career, the Defendants' paid liability expert, Dean Harrison—is a regular in this Court on behalf of defendants in personal injury cases. Although the Court

likes and admires Mr. Harrison, having know him for over 30 years, and almost always appreciates Mr. Harrison's thoughtful, professional and insightful assistance, the Court does not find Mr. Harrison's testimony convincing or helpful regarding the precise cause of this particular accident. The Court finds Mr. Harrison's testimony that Ponce should have seen the snagged wire runner and was completely responsible for his own death as unpersuasive in light of the rest and residue of the witness testimony and evidence. Moreover, Defendants' opening statements promised evidence that mere was an operational reason for the missing wire runner guide. The Court finds that Defendants completely failed to establish any operational reason for the missing wire runner guide either through evidence or witness testimony. In fact, Defendants' liability expert bluntly conceded the same. In sum, the Defendants' alleged version of events, in which they implicate Ponce, are unpersuasive. Therefore, the Court finds that there was no operational reason for the missing wire runner guide and that the Defendants failed to exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore [would] be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety." *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622. The Court finds the vessel and Defendants jointly, severally and completely liable for Decedent's death and the consequent damages; the Court finds no liability on the part of Decedent.

**Conscious Pain and Suffering Damages**

18. The injuries Ponce sustained after being struck by the hoisting wire were horrific. Ponce, a 247–pound man, was caught in the bight of the steel hoisting wire that struck him with tremendous force.

19. The Court recognizes Plaintiffs' forensic pathologist, Dr. Joseph I. Cohen, as an expert in the field of forensic pathology pursuant to Rule 702 of the Federal Rules of Evidence. Dr. Cohen testified that he performs autopsies on a daily basis to certify death certificates. Dr. Cohen testified that he has performed over 4000 autopsies in the past 15 years. Dr. Cohen reviewed post-death photographs of Ponce, the Harris County Police Department's investigative reports, the Harris County medical examiner's autopsy report and investigative report, diagrams of the autopsy, and the reports of John Faulk and Dr. Paul Radelat. Based on his extensive review of the documents, his education, and experience, Dr. Cohen concluded that within reasonable medical probability Ponce lived for approximately one second to one second and a half. Dr. Cohen confirmed that when Ponce was struck by the hoisting wire in the right side of his torso he would have felt severe and immediate pain. Dr. Cohen further testified that the blow to Ponce's right torso fractured his ribs, bruised his right lung and caused other internal injuries that were not necessarily life threatening, and that Ponce would have been aware of his impending doom.

20. Defendants' pathology expert, Dr. Paul Radelat, who this Court recognizes as an expert in the field of anatomical-clinical pathology pursuant to Rule 702, testified that Ponce lived for less than one-tenth of a second after being struck by the hoisting wire. Dr. Radelat bases his opinion on the assumption that Ponce was struck in the right side of his skull and fell from a drum by the controls to the deck of the ship. The Court finds Dr. Radelat's testimony unpersuasive based on the evidence, photographs of Ponce taken immediately after the accident, and the witness testimony. (Exs. 1 and 50). Moreover, Dr. Radelat agreed that if Ponce was thrown approximately 10 feet in the air and 30 feet from

the controls, Ponce would have lived longer than one-tenth of a second.

21. The Court finds Dr. Cohen's testimony reliable and credible regarding the amount of time Ponce survived prior to his death. Moreover, the Court finds that based on the evidence introduced in this case and the witness testimony; Ponce was struck in the right side of his torso and thrown in the air approximately 10 feet and landed 30 feet from where he was initially struck by the hoisting wire. Based on the foregoing, the Court finds that Ponce lived approximately one and a half seconds from the time he was struck by the hoisting wire until the time of his death.

### Economic Damages

22. The Court recognizes Dr. Kenneth G. McCoin, Plaintiffs' economist, as an expert in the field of forensic economics pursuant to Rule 702 of the Federal Rules of Evidence. The Court finds, based upon the testimony of Dr. McCoin, the standards of *Culver II* and its progeny, and the evidence, that Plaintiffs have sustained past and future loss of support, inclusive of past and future wages, fringe benefits, and household services. See *Culver v. Slater Boat Co.*, 722 F.2d 114 (5th Cir.1983).

23. According to Dr. McCoin's testimony, Ponce earned an average of $29,820 per year over the past five years, excluding 2003 for an unrelated injury he sustained. Dr. McCoin calculated Ponce's work-life expectancy at 8.0 years and fringe benefits (unemployment insurance, workers' compensation insurance, etc.) at 3%. Defendants' economist, Dr. James Yeager, who this Court also recognizes as an expert in the field of forensic economics pursuant to Rule 702 of the Federal Rules of Civil Evidence, calculated Ponce's average earning capacity at $29,153, and his expectancy at 8.02 years.

24. Based on Ponce's education, Dr. McCoin testified that Ponce's probability of work through his work-life expectancy is about 68%. Dr. McCoin deducted 7.65% from Ponce's earnings for social security and 0% for federal income tax given Ponce's standard deductions at his level of income. In determining Ponce's total economic loss, Dr. McCoin testified that Ponce consumed only 28% of his income for personal use, i.e. food, clothing, entertainment, transportation, etc., or approximately $9578 per year. Dr. McCoin testified that Ponce had approximately $14,000 net per year in support available to his survivors, which yields a past economic loss in the amount of $15,026, and a future economic loss of $154,439, for a total economic loss in the amount of $169,465. This is the total amount available to all survivors in compensation of their lost support. Dr. Yeager agreed that his calculation was very close to Dr. McCoin's based on Ponce's personal consumption of 27%.

25. Dr. McCoin further testified that a separate calculation is made to determine Ponce's value for household services. Dr. McCoin testified that he calculated Ponce's loss of household services at $54,000.

26. Dr. McCoin testified that based upon the Department of Agriculture study pertaining to the cost of raising children, it would cost around $7000–8000 per year per child. Given the ages of the two grandchildren, who lived with Decedent, Dr. McCoin testified that it would cost approximately $80,000 to raise a child from age 7 to 18, and $60,000 to raise a child from age 11 to 18.

#### (1) *Estate of Abelino Ponce*

27. The Court finds that the Estate of Abelino Ponce is entitled to past and future economic loss and funeral expenses. The funeral bill for Ponce was submitted for payment and never paid by Ponce's employer. The family also could not afford to pay the bill and it remains unpaid.

The Court finds that the funeral expenses incurred by the Estate are $18,849.59.

### (2) Paula Gomez Ponce

28. The Court finds that Paula Gomez Ponce, Ponce's mother, has depended upon Ponce for support and services since her husband's death in the late 1980s. Ponce traveled to Reynosa, Mexico every two or three weeks to care for his mother and her house. Ponce claimed Paula Ponce as a dependent on his federal tax returns and was his mother's sole financial support. The Court finds the witness testimony credible and the evidence supports that Paula Gomez Ponce was financially dependent on Ponce for her support.

### (3) Abel Ponce

29. The Court finds the witness testimony and evidence establishes that Abel Ponce, Ponce's adult child, was given nominal support and services from his father.

### (4) Naomi Ponce and Candaleria Martinez

30. The Court finds that Naomi Ponce and Candaleria Martinez, Ponce's daughters, were financially dependent on and supported by Ponce. Naomi Ponce and her sister, Candaleria, testified that they received approximately $450 per month from Ponce prior to his death. The money given to Naomi and Candaleria by Ponce was used to pay rent and buy groceries. The Court also finds that Ponce provided household services to Naomi and Candaleria.

### (5) Jose Ponce

31. The Court finds that Jose Ponce, one of Ponce's adult sons, received nominal support and services from Ponce. Jose testified that he received approximately $150 every two weeks from Ponce for support.

### (6) Arthur Ponce

32. The Court finds that Arthur Ponce, one of Ponce's sons, received some support and services from Ponce. The Court finds the testimony of Arthur Ponce credible and that he received money from Ponce for down payments on a car and house and that Ponce cared for him when he was unemployed due to medical complications. The Court also finds that Ponce performed services for Arthur by working on his car and around the house.

### (7) Joel Eugene Ponce and Abel Rene Ponce

33. The Court finds that Joel Eugene Ponce and Abel Rene Ponce, Ponce's grandsons, were financially dependent upon Ponce for their support. The witness testimony and evidence establishes that Ponce adopted Joel and Abel as his own sons and claimed them as dependents on his tax returns. The Court finds the testimony of Naomi Ponce and Arthur Ponce credible that Joel and Abel received substantial financial support from Ponce and were Ponce's adopted children. It's also worth noting that Joel and Abel never knew their biological fathers and that Ponce gave his grandchildren his name and acted as their father.

### Non–Economic Damages

34. The Plaintiffs' non-economic losses are significant. The Court finds that the Ponces were a close family that shared in the love, comfort and enjoyment of Abelino Ponce. He was an ever-present, larger-than-life father and father figure to the entire family. In describing their father on the witness stand, Arthur, Jose, and Naomi radiated the love and affection that Ponce had for his family and his place as the father-figure. The emotional testimony brought Ponce to life in the courtroom, and even after over sixteen years on the bench, the Court was deeply moved by the

sincerity and poignancy of it. Naomi intimately described the love Ponce had for Joel and Abel, his two adopted grandsons, and how Ponce cared for his grandsons as his own children. Naomi also described how Ponce always put the family first and provided emotional support for his children through the good and bad times. Arthur described how his father's death has impacted the family and brought them closer together, albeit with an enormous hole in the middle of it. Jose had a slightly different story, having only recently found his biological father, but described how Ponce had visited him on numerous occasions, provided financial and emotional support during difficult times, and introduced him into the Ponce family with loving arms. The Plaintiffs' testimony truly portrayed the grief, loneliness, and stress the family has endured since the untimely death of their father. Given the suddenness of Ponce's death, the Court finds that the witness testimony and evidence warrants a substantial award for non-economic damages, as the Plaintiffs are entitled to recover for loss of consortium and/or society.

**Prejudgment Interest**

■ 35. Pursuant to maritime law, "the awarding of prejudgment interest is the rule rather than the exception, and, in practice, well-nigh automatic." *Cameron v. U.S.,* 135 F.Supp.2d 775, 782 (S.D.Tex.2001)(citing *Reeled Tubing, Inc. v. M/V Chad G,* 794 F.2d 1026, 1028 (5th Cir.1986)). The district court has no discretion to deny prejudgment interest unless peculiar circumstances make the award of interest inequitable. *Noritake Co. v. M/V Hellenic Champion,* 627 F.2d 724, 729 (5th Cir.1980). In this Circuit, prejudgment interest is to be awarded from the date of the casualty to ensure the plaintiff is compensated in full. *Probo II London v. M/V Isla Santay,* 92 F.3d 361 n. 2 (5th cir.1996); *King Fisher Marine*

*Serv., Inc. v. NP Sunbonnet,* 724 F.2d 1181, 1187 (5th Cir.1984).

■ 36. The Court also has broad discretion in setting the rate of prejudgment interest. *See Reeled Tubing,* 794 F.2d at 1029. In setting the rate of prejudgment interest the district court may look to reasonable guideposts, including the interests rate set forth in 28 U.S.C. § 1961 for judgments. *Id.; see also Cameron,* 135 F.Supp.2d at 781. The Court finds that the most equitable rate of prejudgment interest would be 4.96%. Accordingly, the Court finds and awards prejudgment interest at the rate of 4.96% per annum on all damages accrued through the entry of Judgment.

## II.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction over the subject matter of this dispute and over the parties. All parties and claims are properly before this Court and venue is uncontested.

2. The parties stipulated that Abelino Ponce was a longshoreman and may recover for negligence against Defendants pursuant to § 905(b) of the Longshore and Harbor Workers' Compensation Act ("LHWCA"). 33 U.S.C. § 905(b).

3. The Court concludes that Abelino Ponce is a covered employee under the LHWCA.

■ 4. Pursuant to § 905(b) of the LHWCA, the vessel and its owner are liable: (1) if the vessel owner fails to warn on "turning over" the ship of hidden defects of which it should have known; (2) for injuries caused by hazards under the "active control" of the ship; or (3) if the vessel owner fails to "intervene" in the stevedore's operations when it has actual knowledge both of the hazard and that the

stevedore, in the exercise of obviously improvident judgment, means to work on in the face of it and therefore cannot be relied on to remedy it. *Scindia Steam,* 451 U.S. at 167, 101 S.Ct. at 1622 (1981); *Randolph v. Laeisz,* 896 F.2d 964, 970 (5th Cir.1990).

▮ 5. Under the "turnover duty," the shipowner must "at least [exercise] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property." *Scindia,* 451 U.S. at 166–67, 101 S.Ct. at 1622. As a corollary to the shipowner's turnover duty, the shipowner must also "warn the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work." *Id.* at 167, 101 S.Ct. 1614 (emphasis added); *Theriot v. Bay Drilling Corp.,* 783 F.2d 527, 535 (5th Cir.1986); *see also Lincoln v. Reksten Mgmt.,* 354 F.3d 262, 266, 2004 AMC 179 (4th Cir.2003). "The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools and work space to be used in the stevedoring operations; and if he fails to at least warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman." *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243, 1247, 1984 AMC 534 (5th Cir.1982); *Harris v. Flota Mercante Grancolombiana, S.A.,* 730 F.2d 296, 299 (5th Cir.1984)(same); *see also Taliercio v. Compania Empressa Lineas Argentina,* 761 F.2d 126, 128 (2d Cir.1985)(stating that the shipowner has a

"duty to maintain the vessel in a reasonably safe condition," and must exercise due care to "avoid exposing the longshoremen to injury from equipment that is under the shipowner's control."). Moreover, if the "condition existed from the outset, the shipowner is charged with actual knowledge of the dangerous condition and has a duty to warn the stevedore and the longshoremen if the defect is hidden." *See Hernandez v. M/V Rajaan,* 841 F.2d 582, 586 (5th Cir.1988); *Stass v. Am. Commercial Lines, Inc.,* 683 F.2d 120, 122 (5th Cir.1982).

▮ 6. The Court finds that the evidence clearly establishes that the Defendants failed to exercise reasonable care in maintaining, inspecting, repairing, and replacing the crane boom's wire runner guide prior to turning over the M/V ALTAIR to the stevedore and Ponce. The evidence indicates that the condition of the wire runner was noticed by the Defendants or should have been noticed and discovered by the Defendants had proper inspections and maintenance been performed prior to turning over the vessel to the stevedore. The Defendants' failure to warn the Americargo personnel, including Ponce, about the missing wire runner guide and failure to conduct proper inspections and maintenance of the wire runner guide constitutes negligence and was the proximate cause of Ponce's death. Such negligence was a legal and factual cause of the Plaintiffs' damages. Therefore, the Court finds that the Defendants breached their "turn over" duty to "warn the stevedore of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the per-

formance of his work." *See Scindia Steam*, 451 U.S. at 167, 101 S.Ct. at 1622.

7. The Court also finds that the Defendants further breached their "turn over" duty by failing to exercise reasonable care in delivering to the stevedore and Ponce a safe ship with respect to its gear, equipment, tools, and work space to be used in the stevedoring operations prior to turning over the ship. *See Pluyer* 664 F.2d at 1247; *Harris* 730 F.2d at 299. The evidence establishes that the missing wire runner guide was unknown to the stevedores and Ponce.

8. The Court finds that the crane boom's missing wire runner guide was not an open and obvious condition to Ponce.

9. The Court finds that in addition to breaching their "turnover" duty, the Defendants breached their "active control" duty. *Scindia Steam*, 451 U.S. at 166–67, 101 S.Ct. 1614. The shipowner's active control duty extends to injuries caused by hazards or equipment under the active control of the ship. *See Pimental v. LTD Canadian Pacific Bul*, 965 F.2d 13, 16 (5th Cir.1992). Whether a condition falls under the guise of the vessel's active control duty in situations involving the ship itself, the condition of its gear and/or equipment becomes entirely relevant and, in this case, determinative. *See Futo v. Lykes Bros. Steamship Co.*, 742 F.2d 209, 215 (5th Cir.1984) ("The shipowner, after all, is generally primarily responsible for repairing his own ship, its equipment, or gear, and usually stands to gain the most by its proper maintenance ... [and] stands in the best position to appreciate the danger caused by a defect in the ship itself, its gear, or equipment."). The witness testimony and evidence clearly establishes that the vessel's cargo boom was missing a wire runner guide designed to keep the wire running along the underside of the boom and prevent the wire from becoming slack and hanging or snagging on vessel appur-

tenances. Both Plaintiffs' and Defendants' liability experts confirmed that the purpose of the wire runner guide is to prevent the wire from hanging or snagging on cargo, equipment and ship's gear during cargo operations. Unlike the turnover duty, which generally applies to hidden defects, the vessel cannot rely on the stevedore's expertise to repair or replace a missing wire runner guide on a vessel's cargo boom. *See Woodruff v. United States*, 710 F.2d 128 (4th Cir.1983). The Court finds that had the cargo boom been fitted with a wire runner guide as per the vessel's plans and uncontroverted witness testimony, the accident would have been prevented. The Court concludes that the Defendants maintained control over the cargo boom and are liable to Plaintiffs.

10. The Court concludes that the third *Scindia* duty, the "duty to intervene" was also clearly violated by the Defendants. Again, the evidence establishes that the missing wire runner guide was observable by the vessel's crew and representatives, who alone did or should have recognized the risks during cargo operations that the missing wire runner guide would present to the stevedore. The shipowner has the duty "to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation." *Scindia Steam*, 451 U.S. at 167, 101 S.Ct. 1614. Additionally, the shipowner has a duty to correct a known defective condition at the commencement of the cargo operations when the defect creates an unreasonable risk of harm to the longshoremen and the shipowner knows that he cannot rely on the stevedore to protect the longshoremen from that risk. *Id.* at 175–76, 101 S.Ct. 1614; *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 115 (5th Cir.1981). The evidence and expert witness testimo-

ny establishes that the lack of a wire runner guide on the cargo boom posed a hazard to Americargo's personnel and Ponce beyond that which is normally encountered by longshoremen in discharging a vessel. The lack of a wire runner guide on a cargo boom being used to discharge a vessel is not an occurrence commonly experienced by stevedores in the exercise of their profession. The Court concludes that the Defendants violated this duty and such violation caused or contributed to Ponce's untimely death.

■■■■ 11. The Court does not find it persuasive that Ponce contributed in any way to his death. The advisory jury, after carefully weighing the evidence and deliberating over such, found that Ponce and/or his employer were 4% responsible. Accordingly, the Court finds that Ponce's employer, Americargo, was 4% contributorily negligent for the accident, although it does not find Decedent liable. Nevertheless, Defendants are liable, jointly and severally, to Plaintiffs for their damages sustained as a result of the subject accident, including past and future loss of support, lost earnings, funeral expenses, loss of society, conscious pain and suffering, and past and future loss of services. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 271–72, 99 S.Ct. 2753, 61 L.Ed.2d 521 (1979)(stating that the shipowner is jointly and severally liable for damages not due to the longshoreman's own negligence); *see also Foulk v. Donjon Marine Co.*, 963 F.Supp. 427, 430 (D.N.J.1997)(stating that under the rule of joint and several liability, the shipowner is liable for all of the damages even if only found one percent at fault for the longshoreman's injury). A longshoreman, such as Ponce, may recover fully from a negligent shipowner and/or operator even if: (1) the employer is partly at fault for the accident; and (2) the shipowner is otherwise barred from seeking contribution from the employer. *See Edmonds*, 443

U.S. at 268–270, 99 S.Ct. 2753. Therefore, the Defendants are liable for all of Plaintiffs' damages.

12. The Court concludes as a matter of law that Plaintiffs have sustained their burden of proof by a preponderance of the evidence showing that the Defendants herein breached their duty of reasonable care in their capacity as vessel owner and vessel operator pursuant to § 905(b) of the LHWCA. Therefore, the Court finds that Plaintiffs may have recovery herein and the Court will enter Judgment in the Plaintiffs' favor.

■■■ 13. The Court tried the case to an advisory jury and the jury rendered the collective judgment of the community. The Court finds that the advisory jury's recommendation as to damages was largely fair and reasonable. However, the Court finds that the economic damages awarded to Ponce's survivors exceed the earnings which could have been reasonably available to them. Specifically, the jury recommended economic damages to Ponce's survivors totaling $438,250.00 while the expert testimony indicated that Ponce's lost earnings, less taxes and personal consumption, was closer to $169,465.00. In keeping with the jury's relative awards to each survivor, the Court is awarding 39% of the jury's recommendation ($169,465.00 being 39% of $438,250.00) to each survivor, *pro rata*. The Court also finds that the jury's awards for loss of services are excessive. The recommended award to all Plaintiffs for loss of services was $332,500.00. This is more than six times the figure suggested by Plaintiffs' own expert. The Court finds that Dr. McCoin's estimate of $54,000.00 for loss of services is more appropriate. Accordingly, the Court is awarding 16.2% of the jury's recommendation ($54,000.00 being 16.2% of $332,500.00) to each, *pro rata*. The Court also finds that any recov-

ery of past and future lost earnings by the Estate of Abelino Ponce would be an impermissible double recovery. The Court therefore declines to award to Estate any damages for lost earnings. Accordingly, based on the witness testimony and evidence, the Court finds that the Estate of Abelino Ponce is entitled to past and future lost earnings and funeral expenses. The Court awards the Estate $18,849.59 for funeral expenses.

14. The Court finds that the credible expert medical testimony establishes that Ponce lived for at least one and a half seconds after being struck by the wire runner and felt severe pain prior to his death, and in reasonably probability likely was aware of his pending death. The Court finds that the jury's award of $100,000.00 for conscious pain and suffering is excessive under the circumstances. In keeping with the Fifth Circuit awards appropriately adjusted for inflation, the Court finds that $11,200.00 is a more appropriate award for Ponce's conscious pain and suffering, and so awards. See *Haley v. Pan American World Airways, Inc.* 746 F.2d 311 (5th Cir.1984).

15. The Court finds that Abel Ponce received some financial support and services from Ponce and awards $15,502.50 for loss of support and $4,252.50 for loss of services.

16. The Court finds that Arthur Ponce received some financial support and services from Ponce and awards $13,502.50 for loss of support and $4,252.50 for loss of services.

17. The Court finds that Jose Ponce received nominal financial support and services from Ponce and awards $6,142.50 for loss of support and $1,701.00 for loss of services.

18. The Court finds that Paula Ponce was solely dependent on Ponce for her financial support and services and awards $24,570.00 for loss of support and $6,804.00 for loss of services.

19. The Court finds that Naomi Ponce was financially dependent on Ponce for support and services and awards $30,712.50 for loss of support and $8,505.00 for loss of services.

20. The Court finds that the credible witness testimony and evidence establishes that Joel Ponce was Ponce's dependent minor child *in loco parentis.* The Court awards $23,887.50 for loss of support and $9,922.50 for loss of services.

21. The Court finds that Candelaria Martinez was financially dependent on Ponce for support and services and awards $30,712.50 for loss of support and $8,505.00 for loss of services.

22. The Court finds that the credible witness testimony and evidence establishes that Abel Rene Ponce was Ponce's dependent minor child *in loco parentis.* The Court awards $23,887.50 for loss of support and $9,922.50 for loss of services.

23. The Court concludes that Plaintiffs are entitled to recover a substantial amount for loss of companionship and society. A loss of consortium and society award is permissible in this case. *See Sea–Land Servs., Inc. v. Gaudet,* 414 U.S. 573, 585–91, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974); *Moore v. M/V Angela,* 353 F.3d 376, 383 (5th Cir.2003). It is undisputed that Ponce, a longshoreman, was killed while working in the territorial waters of Texas. Although some discrepancies exist between the law governing injuries to longshoremen killed in territorial waters and persons governed by the Death on the High Seas Act or the Jones Act, the Court must apply the law as it is. *See Nichols v. Petroleum Helicopters, Inc.,* 17 F.3d 119, 122–23 (5th Cir.1994).

24. The Court also concludes that Plaintiffs may recover for loss of compan-

ionship and society, regardless of whether they are financially dependent upon Ponce. A showing of financial dependency is not a prerequisite to recover for loss of companionship and society under § 905(b) of the LHWCA. *See Randall v. Chevron, U.S.A.*, 13 F.3d 888 (5th Cir.1994); *Skidmore v. Grueninger*, 506 F.2d 716 (5th Cir.1975) (permitting an adult, non-dependent daughter to recover for loss of her mother's society); *Dennis v. Cent. Gulf S.S. Corp.*, 453 F.2d 137 (5th Cir.1972) (same).

25. In awarding permissible, subjective damages, a trial court's assessment of damages is reviewed for clear error. *Sosa v. M/V Lago Izabal*, 736 F.2d 1028, 1035 (5th Cir.1984). An award is excessive only if it is greater than the maximum amount the trier of fact could have properly awarded. *Id.* at 1035. Each award is reviewed on its own facts. *Winbourne v. Eastern Airlines, Inc.*, 758 F.2d 1016, 1018 (5th Cir.1984). However, comparison of damage awards from similar cases is helpful. *See Wheat v. United States*, 860 F.2d 1256, 1259–60 (5th Cir.1988).

26. Based on the witness testimony and evidence, Ponce was a loving son and father to his children and his adapted grandchildren. The witness testimony and evidence also establishes that Ponce was the presiding father and father figure of a remarkably close-knit, extended family. The Court concludes that the following amounts should be awarded to Ponce's mother, adult children, and adopted grandchildren for loss of consortium and society:

| | |
|---|---|
| Abel Ponce | $ 65,625.00 |
| Arthur Ponce | $ 65,625.00 |
| Jose Ponce | $ 26,250.00 |
| Paula Ponce | $105,000.00 |
| Naomi Ponce | $131,250.00 |
| Joel Ponce | $450,000.00 |
| Candelaria Martinez | $131,250.00 |
| Abel Renee Ponce | $450,000.00 |

The amounts awarded are within the parameters of this Circuit's maximum recovery rule for non-pecuniary damages, and largely in keeping with the jury's advisory verdict, except for the grandchildren adopted as children.

27. Plaintiffs are entitled to pre-judgment interest under general maritime law at a rate of 4.96% per annum.

28. To the extent any Finding of Fact constitutes a Conclusion of Law, the Court adopts it as such. To the extent any Conclusion of Law constitutes a Finding of Fact, the Court adopts it as such.

29. For the reasons set forth in the Court's Findings of Fact and Conclusions of Law, and pursuant to Rule 58 of the Federal Rules of Civil Procedure, Judgment is hereby rendered in favor of Plaintiffs on their stated claims against Defendants. Therefore, Plaintiffs, Candelaria C. Ponce as personal representative of the Estate of Abelino Ponce, Abel Ponce, Naomi Ponce, Candelaria Martinez, Joel Eugene Ponce, Abel Rene Ponce, and Paula Gomez Ponce, shall have and recover from Defendants M/V ALTAIR, her engines, boilers, tackles, apparel, etc., Scarlati Ventures, Inc., and B Navi Spa, the total amount of $1,779,832.09, plus taxable costs of court and pre-judgment interest as set forth herein, and post-judgment interest at the rate of 4.96% per annum, for which execution shall issue if not time paid. Out of said recovery, Plaintiffs shall repay the stipulated compensation lien of $7,640.29 to Intervenor Texas Mutual Insurance Company.

**IT IS SO ORDERED.**